**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

FEDERATION OF ASSOCIATIONS IN BEHAVIORAL & BRAIN SCIENCES;

SOCIETY OF EXPERIMENTAL SOCIAL PSYCHOLOGY;

SOCIAL AND AFFECTIVE NEUROSCIENCE SOCIETY;

GREGG SPARKMAN; and

JENNA CROTEAU,

*Plaintiffs*,

v.

NATIONAL SCIENCE FOUNDATION;

BRIAN STONE, in his official capacity as Chief of Staff performing the duties of the Director of the National Science Foundation;

*Defendants*.

Case No. __________

# COMPLAINT

## INTRODUCTION

1. The National Science Foundation's Directorate for Social, Behavioral, and Economic Sciences (SBE) provides almost two thirds of federal funding for basic academic research in the social, behavioral, and economic sciences in the United States.

2. The SBE sciences encompass a range of fields that study human behavior and socioeconomic systems—from economics and political science to psychology and neuroscience. Congress has repeatedly recognized that federal support for these fields is of "fundamental importance" to "advancing scientific understanding of public health, defense and security, education and learning, and the interface between humans and technology." S. Rep. No. 119-44, at 164 (July 17, 2025). For good reason. Over the last century, SBE research has driven some of the most groundbreaking innovations in nearly every aspect of modern life—from the way doctors match kidney donors with patients, to how governments approach economic policy, national security, and international relations, to the models behind Google's search engine. SBE research has helped mitigate the opioid crisis, the spread of diseases like Ebola and COVID-19, and evolving threats posed by cyberhackers and terrorist networks in the United States and abroad. And it has transformed economics. Indeed, "economists funded by the [SBE] directorate dominate the roster of Nobel prizes awarded in that discipline," demonstrating "the social sciences' broad impact on decision making and quality of life throughout the world."[1]

3. When the Trump-Vance Administration took office, it deemed these fields "woke." In its 2026 budget proposal, the administration urged Congress to cut funding for the SBE Directorate. Congress refused. The congressional report that accompanied NSF's January 2026 appropriation expressly directed NSF not to reduce SBE's budget by more than 5 percent.

---

[1] France A. Córdova, 14th Director of NSF, Foreword to Vannevar Bush, *Science: The Endless Frontier, 75th Anniversary Edition* at v (2021), https://perma.cc/8BTD-4TMS.

4. Three months later, NSF decided to shutter the Directorate anyway. On April 3, 2026—without a Director, and without consulting the National Science Board, the body Congress required to make such decisions—NSF leadership announced that it would unilaterally "close-out" the SBE Directorate in fiscal year 2027. Since the April 3 decision, the agency has stopped funding opportunities for basic SBE research, released the scientists who work in the Directorate on assignment from universities, and reassigned nearly all the Directorate's permanent staff.

5. NSF's decision to close the SBE Directorate will devastate social, behavioral, and economic sciences in the United States. SBE is the only NSF Directorate that supports basic social, behavioral, and economic science research. Each year, it distributes almost $250 million to universities and non-profit research institutions in all corners of the country. Without that funding, hundreds of promising research projects directed to the pressing problems of our time—from the use and effects of artificial intelligence to child development in the age of social media—will never proceed. Thousands of people will lose their jobs. A recent study estimates that the resulting loss of federal investment will cost U.S. communities $756 million.[2]

6. The decision to dismantle the SBE Directorate is not only reckless; it is illegal. Under the Foundation's governing statute, the 25-member National Science Board has the sole authority to "establish the policies of the Foundation." 42 U.S.C. § 1863(a). The Board's members are experts "eminent" in their fields who represent "the views of scientific and engineering leaders in all areas of the Nation." *Id.* § 1863(c). While NSF's Director manages the Foundation's operations and day-to-day grantmaking, the Director must seek the Board's approval before making major changes to NSF's policies, structure, or investments. And the Director may only eliminate or add an NSF division "in consultation with the Board." *Id.* § 1866.

[2] Alex Music, *Cuts to NSF's Social, Behavioral and Economic Sciences (SBE) Directorate will have significant economic impacts nationwide*, Sci. & Cmty. Impacts Mapping Project (July 12, 2026), https://perma.cc/5TF7-9GKG.

7. In this case, NSF's leadership not only failed to consult the Board about closing the SBE Directorate; it did not even warn the Board before it announced the shutdown—Board members read about the closure in the news along with the rest of the public. The choice to bypass the Board was not an isolated one. Since the Trump-Vance Administration took office in January 2025, Foundation leadership had kept the Board in the dark while the administration worked to transform NSF—a storied institution governed, staffed, and advised by the nation's greatest scientific minds, and long driven by the needs identified by America's scientific community—into a political tool. Indeed, just weeks after the April 3, 2026 decision to eliminate the SBE Directorate without Board approval, the President summarily fired the whole Board.

8. Worse, NSF did not even have an authorized Director when the agency made the decision to close SBE. Under NSF's governing statute, NSF's Director must be appointed by the President and confirmed by the Senate. 42 U.S.C. § 1864. But the Foundation's Senate-confirmed Director resigned in April 2025. In these circumstances, federal law allows another official to perform the Director's duties temporarily only if he or she was the Director's "first assistant" or designated by "the President (and only the President)" to fill the role. 5 U.S.C. § 3345. But the Director had no first assistant (the Deputy Director, 42 U.S.C. § 1864a) when he resigned, and Defendant Brian Stone—the NSF Chief of Staff now purporting to perform the duties of the Director—was not designated by the President to fill that role. So even if the Director could dissolve a Directorate without Board approval, Defendant Stone had no authority to make that decision.

9. Nor has NSF provided any public explanation for the Directorate's closure. In response to questions from a reporter, a White House spokesperson said that the administration "is committed to cementing America's dominance in cutting-edge technologies of the future—innovation that is being driven by advancements in hard sciences, not in ideologically-driven

'social sciences.'"[3] The administration has not explained why it believes entire fields like psychology and economics are "ideologically driven." But if that is the agency's rationale, it directly conflicts with NSF's organic statutes, which repeatedly direct the Foundation to support the social sciences. Defendants have offered no reason to believe the Foundation will meet those statutory mandates without the division that exists for that purpose.

10. NSF cannot shut down the government's largest source of funding for an entire scientific sector without a Director and without consulting the body Congress created to make such decisions. And it certainly cannot do so with no explanation. The closure of the SBE Directorate thus violates NSF's governing statute and the Administrative Procedure Act (APA). The Court should vacate the decision to close the SBE Directorate and enjoin Defendants to restore it.

## PARTIES

### Plaintiffs

11. The Federation of Associations in Behavioral and Brain Sciences (FABBS) is a nonprofit organization that works to advance human understanding of the mind, brain, and behavior through advocacy and education to Congress, federal agencies, and the broader scientific community. Its members include 35 societies of behavioral and brain scientists, 60 academic affiliates, including university departments of psychology and brain sciences, and two corporate affiliates. The scientists who comprise FABBS's member associations and departments rely heavily on a range of SBE programs, including its programs for cognitive neuroscience, linguistics, social psychology, human networks and data science, and decision, risk, and management studies.

---

[3] Hana Kiros, *The Trump Administration Is Done with Social Science*, Atlantic (May 30, 2026), https://perma.cc/82VF-2J88.

12. The Society of Experimental Social Psychology (SESP) is a scientific, nonprofit organization dedicated to advancing social psychological research by giving social psychologists opportunities for direct scientific exchange and collaboration. SESP's members include 1,353 social psychologists, who typically have doctoral degrees in social psychology or related fields and hold academic positions. Many of SESP's members also depend on the SBE Directorate to fund their work. Over the past decade, at least 200 SESP members received funding from the Directorate, associated with 319 NSF SBE awards.

13. The Social and Affective Neuroscience Society (SANS) is a scientific society committed to research on the neural basis of social and affective processes. In the 2025–2026 membership year, SANS's members comprise approximately 300 researchers in the social and affective neurosciences. Almost three quarters of these are trainee scientists—graduate students, postdoctoral researchers, or research assistants, who as a group rely on funding from NSF's SBE Directorate to fund fellowships and other research at a critical stage in their careers.

14. Gregg Sparkman is an Assistant Professor at Boston College who received his Ph.D. in psychology from Stanford University. His research examines how people are influenced by the actions and attitudes of others, including the factors that make people more or less open to personal changes in their lives or broader changes in society. His research has implications for strategies to encourage healthy diets, for efforts to conserve natural resources, and for law and policy. He has relied on the SBE Directorate to fund his work, receiving two major grants in the past five years. Dr. Sparkman resides in Massachusetts.

15. Jenna Croteau is a lecturer in the Department of Linguistics at the University of Massachusetts Amherst who received her Ph.D. in Psychology (Developmental Science) from the University of Massachusetts Amherst in September 2026. Her research focuses on how children learn language and mathematics. Because of the closure of the SBE Directorate, Dr.

Croteau has been unable to obtain funding for postdoctoral research, a critical step for early career researchers. Dr. Croteau resides in Massachusetts.

**Defendants**

16. The National Science Foundation is an executive agency consisting of the National Science Board and a Director of the Foundation.

17. Brian Stone is described by NSF as the "Chief of Staff, Performing the Duties of the Director for the U.S. National Science Foundation."[4]

## JURISDICTION AND VENUE

18. This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the APA, 5 U.S.C. § 551 *et seq.*

19. This Court has authority to stay and vacate agency action under 5 U.S.C. §§ 705 and 706. The Court may enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

20. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and officers of that agency sued in their official capacity and because Plaintiffs Gregg Sparkman and Jenna Croteau reside in this judicial district.

## FACTUAL ALLEGATIONS

### I. The National Science Foundation

21. Congress created the National Science Foundation to meet a "Nation-wide demand" for federal funding for basic scientific research that swelled after World War II. S. Rep. No. 81-90 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 2269, 2270. Years of hearings and studies had revealed the "grave need for more trained scientists in America," to "stimulat[e] American

[4] Nat'l Sci. Found., *NSF FY 2026-2030 Strategic Plan*, nsf.gov, https://perma.cc/TA73-WYSN.

research in the basic sciences," and to provide "a responsible program of directing and coordinating such basic research." *Id.* As the Senate Committee explained, there was "little question" that private industry was "well equipped" to advance the "applied sciences." *Id.* But private companies pursued goals "peculiar to their own interests," not the general welfare. *Id.* And in the field of "basic research"—"'the discovery of fundamental new knowledge and basic scientific principles'" on which industrial, medicinal, and technological innovations are built—America "'occupied a secondary place.'" *Id.* at 2271 (quoting Vannevar Bush, *Science: The Endless Frontier* (1945)).

22. That disadvantage was a threat to the nation's place on the world stage. Basic science was, as it remains, the "pacemaker of technological progress." *Id.* at 2271 (citation omitted). And "[i]n the next generation, technological advance and basic scientific discovery [would] be inseparable." *Id*. (citation omitted). So if the United States had to "borrow[] its basic knowledge" from other nations, it would "be hopelessly handicapped in the race for innovation." *Id*.

23. Congress passed the National Science Foundation Act of 1950 (as amended, the "NSF Act") to ensure that the United States would not fall behind in that competition. The Act creates the Foundation and directs it to "initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. § 1862(a)(1).

24. The Foundation "consist[s] of a National Science Board and a Director." *Id.* § 1861.

25. Congress created the Board to "establish the policies of the Foundation." *Id.* § 1863(a). By congressional design, the Board included 24 "eminent" leaders in their scientific fields, "selected solely on the basis of established records of distinguished service" to represent the "views of scientific and engineering leaders in all areas of the Nation," along with the NSF

Director. *Id.* § 1863(c). The Board has the power to approve or disapprove grants and contracts, *id.* § 1864(e)(1), and set personnel policies, *id.* § 1873(a)(1).

26. The Director formulates and administers the Foundation's programs "in consultation with the Board" and "in conformance with the policies" the Board sets. *Id.* § 1864(d). The Board has delegated to the Director the power to make most awards below a monetary threshold. *Resolution NSB–2017–5: Delegation of Award-Approval Authority to the Director*, 82 Fed. Reg. 12129 (Feb. 28, 2017) (allowing the Director to make any award not "involving an anticipated average annual amount of the greater of either 1 percent or more of the awarding Directorate's or Office's prior year current plan or 0.1 percent or more of the prior year total NSF budget"). But the Board has retained the authority to "set policies related to awards,"[5] and to approve or disapprove agency actions that involve amounts over the threshold, 82 Fed. Reg. at 12129.

27. By statute, the Director must consult with the Board before making changes to NSF's divisional structure. The Director may determine which divisions "shall be within the Foundation" only "in consultation with the Board." 42 U.S.C. § 1866.[6]

28. For decades, the Foundation respected that division of authority and the Board's policymaking prerogatives. NSF leadership routinely involved the Board in decisions about the Foundation's organizational structure, strategic priorities, and budget. As explained below, that changed in 2025, when NSF leadership overhauled the Foundation, and eventually dismantled the SBE Directorate, without consulting the Board.

[5] Nat'l Sci. Found., *NSB Committees*, nsf.gov, https://perma.cc/U6GT-QWSM.

[6] Section 1866 uses the term "Divisions," terminology that dates to NSF's original organizational structure, in which the Foundation's principal scientific units were designated as "divisions." NSF's principal organizational units are today denominated "Directorates," which until late 2025 contained subunits called "Divisions." *See* Nat'l Sci. Found., *Our Directorates and Offices*, nsf.gov, https://perma.cc/K77U-ZL2P.

## II. The Directorate for Social, Behavioral, and Economic Sciences

29. Today, NSF has eight divisions, called "Directorates": one for Biological Sciences; one for Computer, Information Science, and Engineering; one for STEM Education; one for Engineering; one for Mathematical and Physical Sciences; one for Geosciences; one for Technology, Innovation, and Partnerships; and one for Social, Behavioral, and Economic Sciences—the division at issue here.

30. The social, behavioral, and economic sciences study human behavior, social organizations, and economic systems. They include anthropology, archaeology, demography, economics, geography, linguistics, neuroscience, political science, psychology, sociology, and statistics. SBE scientists investigate how people perceive and attend to the world; learn, remember, reason, read, use language, and make decisions; how children develop and cognitive abilities change across the lifespan; how neural, physiological, genetic, and environmental factors shape human behavior; how people experience and regulate emotions; and how individuals form impressions, relationships, stereotypes, and social identities. Other SBE research examines cooperation and conflict, social inequality and mobility, political beliefs and democratic participation, and the functioning of human groups, organizations, and institutions.

31. These questions are foundational to understanding human behavior and society, with implications for education, well-being, and economic prosperity, as well as "emerging technologies such as artificial intelligence (AI) and biotechnologies; national security; and finding new ways to improve quality of life."[7] Indeed, research in the SBE sciences, much of it

[7] Nat'l Sci. Found., *FY 2026 Budget Request to Congress* at R&RA 13 (2025), https://perma.cc/A3JV-VB63.

funded by NSF, has driven advances in nearly every important domain of human society—from healthcare and industry to economic policy and national security.[8] To take just a few examples:

- ***Across Domains***. Foundational research on game theory has produced solutions to wide-ranging complex problems: matching kidney donors with patients;[9] designing the algorithms behind Google's search engine and business model;[10] and managing leasing rights for offshore oil fields and forests.[11] And NSF-funded research into human decision-making has led to the widespread use of behavioral interventions, or "nudges," that have saved workers billions in retirement funds,[12] dramatically increased life-saving organ donations,[13] and saved electricity without compromising freedom of choice.[14]

- ***Health.*** NSF-funded "research on opioid addiction has increased understanding of the neuroscience of addiction, substance abuse intervention, the role of illicit supply networks, the secondary effects on families, the use of technology to address the opioid epidemic, and options for alternative, non-addictive therapeutics for pain." Pub. L. No. 116-335, § 1(b), 134 Stat. 5117 (codified at 42 U.S.C. § 1862u, note). SBE research into epigenetics—the study of how behavioral and environmental factors like diet, chronic stress, and toxins affect gene expression—has informed policy interventions in maternal

---

[8] *See* Nat'l Acads. of Scis., Eng'g, & Med., *The Value of Social, Behavioral, and Economic Sciences to National Priorities: A Report for the National Science Foundation* at 5–9 (2017) ("*NASEM Report*"), https://perma.cc/6ZUL-2LBW.

[9] *Id.* at 9–10.

[10] *Id.* at 10.

[11] *Id.* at 10.

[12] *Id.* at 19.

[13] *Id.*

[14] *Id.*

health, child abuse, and pollution control.[15] SBE research has helped contain deadly epidemics like Ebola[16] and address and recover from the COVID-19 pandemic.[17]

- ***Technology, Business, and Economic Innovation***. Beyond its contributions to Google's search engine and business model, NSF-funded SBE research in neuroscience, particularly into the neural networks in the brain, laid the groundwork for modern artificial intelligence.[18] Businesses from airlines to food producers to semiconductor manufacturers have applied SBE research to reduce accidents, improve productivity and marketing, and revolutionize pricing.[19]
- ***Law and Public Safety.*** NSF-supported research on human memory and perception has revealed fundamental limitations of eyewitness testimony,[20] informing efforts to improve criminal identification procedures and reduce wrongful convictions.[21] It has also advanced understanding of criminal behavior, policing, judicial decision-making, and the effectiveness of legal institutions.[22]

---

[15] *Id.* at 11–12.

[16] *Id.* at 23.

[17] *See* Nat'l Sci. Found., *NSF SBE Response to COVID-19: Rapid Research Grants (RAPID)*, nsf.gov, https://perma.cc/CUS3-G8PX (listing research awards funded by SBE in response to COVID-19); Jay J. Van Bavel et al., *Using Social and Behavioural Science to Support COVID-19 Pandemic Response*, 4 Nature Hum. Behav. 460, 460–65 (2020), https://perma.cc/PLF5-WC9T (synthesizing NSF-funded SBE frameworks deployed during the public health crisis).

[18] Katharine Miller, *From Brain to Machine: How Early Cognitive Research Paved the Way for Today's AI Breakthroughs*, Stan. Rep. (Nov. 18, 2024), https://perma.cc/B97J-VCL5.

[19] *See NASEM Report*, *supra* note 8, at 25–26.

[20] *Id.* at 13–14.

[21] Memorandum from Sally Q. Yates, Deputy Att'y Gen., to Heads of Dep't L. Enf't Components & All Dep't Prosecutors, *Eyewitness Identification: Procedures for Conducting Photo Arrays* (Jan. 6, 2017), https://perma.cc/Z92X-3SSU.

[22] *See* Nat'l Sci. Found., *Law & Science (LS)*, Program Solicitation NSF 23-538, https://perma.cc/W48H-3PXJ (funding research on crime, violence, and policing; courts and judicial decision-making; and legal institutions).

- ***Social Relationships and Human Connection.*** NSF-funded SBE research has illuminated how people form and maintain relationships, develop trust, experience empathy, and build social connections.[23] Research into the psychological and neural mechanisms of social interaction has revealed how relationships shape behavior, well-being, and responses to stress, with implications for reducing social isolation, strengthening interpersonal relationships, and improving cooperation in families, workplaces, and communities.[24]
- ***Fairness and Discrimination.*** NSF-funded SBE research has revealed how people form impressions of others, interpret their emotions and intentions, and develop stereotypes and biases that unintentionally influence social behavior.[25] These discoveries have advanced understanding of how prejudice and discrimination emerge, persist, and can be reduced, with implications for improving fairness in employment, education, and healthcare.[26]

---

[23] Nat'l Sci. Found., *Social Psychology (SP)*, Program Description PD 22-1332, https://perma.cc/XFL5-4SVM (supporting basic research on social and affective neuroscience and social interaction).

[24] *See, e.g.*, Nat'l Sci. Found., Award No. 2220801, *The Cognitive Mechanisms of Support-Giving* (2022); James A. Coan, Hillary S. Schaefer & Richard J. Davidson, *Lending a Hand: Social Regulation of the Neural Response to Threat*, 17 Psych. Sci. 1032 (2006); U.S. Dep't of Health & Hum. Servs., Off. of the Surgeon Gen., *Our Epidemic of Loneliness and Isolation: The U.S. Surgeon General's Advisory on the Healing Effects of Social Connection and Community*, 18–25 (2023), https://perma.cc/NQ5D-UEML.

[25] Anthony G. Greenwald, Debbie E. McGhee & Jordan L.K. Schwartz, *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. Personality & Soc. Psych. 1464 (1998), https://perma.cc/YP28-48SW (NSF Grants SBR-9422242 & SBR-9710172); Patricia G. Devine et al., *Long-Term Reduction in Implicit Race Bias: A Prejudice Habit-Breaking Intervention*, 48 J. Experimental Soc. Psych. 1267, 1267–71 (2012), https://perma.cc/539X-9XAN.

[26] *See, e.g.*, Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 Am. Econ. Rev. 991 (2004).

- ***Psychological Well-Being.*** SBE research has advanced understanding of how people experience and regulate emotions, respond to social threats, and adapt to stressful circumstances, with implications for mental health and well-being.[27]
- ***Cooperation and Communication.*** NSF-funded SBE research has led to insights about how people communicate, influence one another, establish trust, and coordinate behavior to achieve shared goals.[28] Research into social influence, empathy, cooperation, and group dynamics has illuminated the mechanisms through which individuals make collective decisions, resolve conflicts, and maintain functioning social groups, with implications for organizational leadership, teamwork, conflict resolution, and community resilience.[29]
- ***Public Welfare.*** SBE-funded advances in behavioral economics have informed the design of federal spectrum auctions,[30] generating substantial public revenues and improving the allocation of valuable resources, and increased participation in retirement savings programs.[31] Decades of NSF-supported longitudinal research have informed policies concerning poverty, employment, economic mobility, and social welfare.

---

[27] *See, e.g.*, Nat'l Sci. Found., Award No. 2419464, *Collaborative Research: Neural and Behavioral Predictors of Health and Well-Being in the Transition to Adulthood* (2024–2027); Nat'l Sci. Found., Award No. 1752848, *CAREER: Mechanisms of Ambiguity and Emotion Regulation* (2018–2025) (awarded to Dr. Maital Neta); Nicholas R. Harp, James J. Gross, Andero Uusberg & Maital Neta, *The Role of Trait Reappraisal in Response to Emotional Ambiguity: A Systematic Review and Meta-Analysis*, 24 Emotion 935, 935–46 (2024) (supported by NSF Award No. 1752848); *see also* Nat'l Sci. Found., Award No. 1554683, *CAREER: The Effects of Process Facilitation on Emotion Regulation* (2016).

[28] *See NASEM Report*, *supra* note 8, at 18–19.

[29] *Id.*

[30] *Id.* at 21.

[31] *Id.* at 19.

- ***National Security and Defense***. NSF-funded SBE research has also produced models used by the Departments of Defense, Homeland Security, and intelligence agencies to combat terrorist networks, hacker networks, and insurgencies; detect illicit and hazardous cargo at U.S. ports; and forecast political instability and upheaval.[32]

32. NSF has had a dedicated program or division for social sciences for almost 70 years,[33] and the current SBE Directorate has overseen grants related to the SBE sciences for 35 years.[34]

33. The Foundation established the SBE Directorate in 1991, following the recommendation of a task force of prominent biologists and social scientists. Both fields—biology and social science—had "grown in complexity and sophistication until they constitute[d] a major part of the intellectual endeavor of today's science," and both "play an important role in formulating the solutions to virtually every major problem facing humankind."[35] The task force recognized that SBE sciences would be "extremely important in our understanding of the sweeping changes taking place in human societies as we enter the 21st century."[36] Yet, the then-existing combined Directorate of Biological, Behavioral, and Social Sciences was "far too broad to give sufficient attention to the social, economic, and psychological sciences while still encompassing the full range of fields within the biological sciences."[37] Social scientists, the task force explained,

---

[32] *Id.* at 22–23.

[33] *See* Nat'l Sci. Found., 8th Annual Report 41 (1958) (noting the establishment of the Social Science Research Program in 1957); Nat'l Sci. Found., 9th Annual Report 44 (1959) (establishment of Office of Social Sciences); Nat'l Sci. Found., 11th Annual Report 44 (1961) (establishment of Division of Social Sciences); Nat'l Sci. Found., 26th Annual Report 67 (1976) (establishment of Directorate of Biological, Behavioral, and Social Sciences).

[34] Nat'l Sci. Found., *History*, nsf.gov, https://perma.cc/6WWF-BW6J.

[35] NSF Report No. NSF9168, Adapting to the Future—Report of the BBS Task Force Looking to the 21st Century (Nov. 2, 1991), https://perma.cc/A47Q-DP77.

[36] *Id.*

[37] *Id.*

needed a Directorate that "fosters the particular styles of research and education they practice" and the unique "instrumentation and data requirements in their fields."[38]

34. Since 1991, the SBE Directorate has grown to provide almost two thirds of federal funding for basic academic research in the social, behavioral, and economic sciences in the United States, distributing an average of approximately $247 million in grant funding per year.[39]

35. To solicit, award, and manage these grants, the SBE Directorate has historically maintained more than 20 standing research programs across its divisions.[40] These programs provide dedicated, recurring opportunities for researchers at universities and research institutions across the country to compete for federal funding to pursue innovative and transformative research advancing fundamental scientific understanding in their respective fields.

36. Through regularly scheduled proposal competitions, researchers submit their most promising ideas for scientific peer review. The proposals then undergo review by panels of independent scientists with expertise in the relevant area. NSF program officers—themselves scientists with specialized scientific expertise in the respective fields—consider the peer-review evaluations and make recommendations about which proposals merit funding. Review follows two broad criteria: Intellectual Merit (the proposal's potential to advance science within its own

[38] *Id.*

[39] Nat'l Sci. Found., FY 2023 *Budget Request to Congress*, SBE-3 (2022), https://perma.cc/RA8P-LVGU.

[40] Programs included Social Psychology; Cognitive Neuroscience; Developmental Sciences; Perception, Action, and Cognition; Science of Learning and Augmented Intelligence; Archaeology; Biological Anthropology; Cultural Anthropology; Linguistics; Human-Environment and Geographical Sciences; Human Networks and Data Science; Economics; Sociology; Accountable Institutions and Behavior; Decision, Risk and Management Sciences; Law and Science; Methodology, Measurement, and Statistics; Science and Technology Studies; Science of Organizations; Science of Science; and Security and Preparedness, among others.

field or across fields) and Broader Impacts (the proposal's potential to benefit society).[41] After an NSF program officer recommends the worthiest projects, the division director approves them.[42]

37. This structure has ensured that federal investments in fundamental SBE research are informed by scientific expertise, independent peer review, and the potential of proposed discoveries to advance their respective disciplines.

38. Beyond the Foundation's core statutory mandate to support the "social" sciences, 42 U.S.C. § 1862(a)(1), federal statutes require NSF to fund specific types of research in the social, behavioral, and economic sciences—including research on opioid addiction, human trafficking, suicide prevention, and the impacts of inflation.[43]

39. Federal law specifically requires NSF to "support research on labor market analysis innovations, data and information sciences, electronic information tools and methodologies, and

---

[41] Nat'l Sci. Found., *Proposal and Award Policies and Procedures Guide*, NSF 24-1, at III-2 (2024), https://perma.cc/WUB3-SDDU.

[42] *Id.* at III-4.

[43] *See* 42 U.S.C. § 19055 (requiring the Director to "solicit proposals for social, behavioral, and economic science researchers to participate in cross-cutting and interdisciplinary programs" and "ensure social, behavioral, and economic science researchers are represented on relevant merit review panels for such activities."); *id.* § 19066 (requiring funding for research on "social media and consumer technology access and use patterns and related mental health, behavioral, and substance use disorder issues, particularly for children and adolescents" and "the role of social media and consumer technology in rising rates of mental health and substance use disorder issues, including within communities experiencing long-term economic distress"); *id.* § 19070 (research into the "impact of inflation"); *id.* § 1862u (research on "the science of opioid addiction"); *id.* § 1862v ("multidisciplinary, fundamental research with potential relevance to suicide, including potential relevance to prevention and treatment, including" research on human behavior, cognition, and development, subject to appropriations); *id.* § 1862w ("research on the impact of online social media platforms on the maintenance or expansion of human trafficking," including "social and behavioral research related to social media platform users who engage with those promoting or involved in human trafficking"); *id.* § 19056 ("research and development of data, models, indicators, and associated analytical tools to improve our understanding of the impacts of Federally funded research on society, the economy, and the workforce, including domestic job creation").

metrics" "through the Directorate of Social, Behavioral & Economic Sciences." Pub. L. No. 115-402, § 4(a), 132 Stat. 5343, 5346 (codified at 42 U.S.C. § 1862p, note).

40. In addition to its grantmaking functions, SBE is the primary funder of the nation's "big three" social science surveys: the General Social Survey (GSS), the American National Election Studies (ANES), and the Panel Study of Income Dynamics (PSID).[44] These are critical "national resources for research and teaching,"[45] and support for the three surveys has at times accounted for roughly one sixth of the Foundation's social science budget.[46] Social science researchers refer to these surveys as their "telescopes"—comparing them in investment and importance to the massive observatories on which astronomers around the world rely for their data.

41. The surveys' value lies in their extraordinary, undisrupted continuity over their decades of data collection. The Panel Study of Income Dynamics is the world's longest-running household panel survey, having followed the same families and their descendants since 1968, and plays a critical role in the study of economic mobility and the long-term effects of child poverty. The American National Election Studies has surveyed American voters since 1948, and the General Social Survey has tracked Americans' attitudes and behaviors since 1972.

42. These surveys form the empirical foundation of American social science research, supporting tens of thousands of peer-reviewed studies, doctoral dissertations, and university curricula.[47] For example, the American National Election Studies has alone underpinned more

[44] Hana Kiros, *The Trump Administration Is Done with Social Science*, Atlantic (May 30, 2026), https://perma.cc/82VF-2J88.

[45] Nat'l Sci. Found., *FY 2023 Budget Request to Congress* SBE-7 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU.

[46] Hana Kiros, *The Trump Administration Is Done with Social Science*, Atlantic (May 30, 2026), https://perma.cc/82VF-2J88.

[47] *See GSS Publications Database*, NORC at the Univ. of Chi., https://gss.norc.org/get-documentation/bibliography.html; *PSID Bibliography of Publications*, Univ. of Mich. Inst. for Soc. Rsch., https://psidonline.isr.umich.edu/Publications/.

than 10,000 scholarly publications,[48] providing a foundational dataset for understanding the health of our democracy, electoral dynamics, and public trust in our core institutions over the past seven decades. Scholars and academic institutions nationwide rely on the continuous generation of this longitudinal data to support research and train future generations of scientists.

43. Researchers rely on the big three surveys not only for their substantive findings but also as a methodological benchmark for the broader scientific community. Surveys like the American National Election Studies utilize rigorous national sampling that maximizes response rates and minimizes bias. This allows scholars to use these surveys as baselines to assess the representativeness of their samples, which has serious implications for the validity and generalizability of their findings. Further, these surveys also drive innovation in survey methodology, including addressing nonresponses,[49] that then benefit the broader research community. Overall, the academic community significantly relies on the continuity of these surveys to preserve methodological integrity and accuracy in public opinion research.

44. Alongside researchers, federal agencies also rely significantly on the SBE Directorate's surveys.[50] The Federal Reserve Board, for instance, used the Panel Study of Income Dynamics to analyze families' mortgage distress during the Great Recession,[51] and the Bureau of Labor

---

[48] *The ANES Bibliography*, Am. Nat'l Election Stud., https://electionstudies.org/papers-documents/anes-bibliography/.

[49] Lauren Guggenheim et al., *Understanding Nonresponse in Live Video Survey Interviews: Evidence from Two Tests Conducted as Part of the American National Election Studies (ANES)*, 20 Methods, Data, Analyses 46 (2026), https://perma.cc/N8WN-AFCY.

[50] *Panel Study of Income Dynamics (PSID)*, Univ. of Mich. Inst. for Soc. Rsch., https://perma.cc/Y5EX-ZYRJ.

[51] Katherine McGonagle & Narayan Sastry, *Using the Panel Study of Income Dynamics to Analyze Housing Decisions, Dynamics, and Effects*, 18 Cityscape 185 (2016), https://perma.cc/JK8X-6VRK.

Statistics has used it to document a decades-long decline in workers' job mobility.[52] Similarly, the National Institute for Occupational Safety and Health's survey (conducted through the General Social Survey)[53] has supported research that has documented rising job strain among American workers, helping draw connections with cardiovascular disease.[54]

45. The National Science Board has itself relied on the General Social Survey to produce its statutorily required Science and Engineering Indicators Report. 42 U.S.C. § 1863(j)(1).[55] Ironically, the Board has used the GSS to report whether Americans believe the federal government should fund basic research.[56] Eighty-eight percent do.[57]

46. In addition to these national surveys, NSF SBE funds numerous investigator-initiated longitudinal studies in which researchers repeatedly collect data from the same participants to understand how social experiences, psychological functioning, and brain development change over time.[58] The scientific value of these projects depends in part on their continuity: following

---

[52] Maury Gittleman, *Declining Labor Turnover in the United States: Evidence and Implications from the Panel Study of Income Dynamics*, Monthly Lab. Rev., Jan. 2019, https://perma.cc/F99G-RQ9P.

[53] *Quality of Worklife Questionnaire*, Nat'l Inst. for Occupational Safety & Health, https://perma.cc/7XL3-HR2X.

[54] Stephanie Myers et al., *Changes in Work Characteristics over 12 Years: Findings from the 2002–2014 US National NIOSH Quality of Work Life Surveys*, 62 Am. J. Indus. Med. 511 (2019), https://perma.cc/7EGL-BGVL.

[55] Nat'l Sci. Bd., NSB-2024-4, *Science and Technology: Public Perceptions, Awareness, and Information Sources* fig. PPS-1 (2024), https://perma.cc/YUP8-TE3D.

[56] *Id.*

[57] *Id.*

[58] For example, NSF award #2336167 (2024–2027) supports new assessments of emotional responses to stress among individuals followed since infancy over more than 50 years, linking their current experiences to detailed measurements collected during childhood. NSF award #2337600 (2024–2029) supports an 18-month study combining repeated surveys, real-time assessments, and eye-tracking to examine how adolescents' social media experiences affect body image and psychological well-being. NSF award #2419389 (2024–2027) supports repeated assessments of children's developing understanding of others' thoughts and feelings over three

the same participants, preserving carefully timed assessments, and measuring social, behavioral, and neural changes as they occur. Disruptions to longitudinal data collection risk permanently losing observations that cannot be recovered retrospectively, potentially compromising years or even decades of scientific investment.

### III. The administration begins to overhaul NSF without Board approval

47. Before 2025, the Foundation followed the decision-making structure set forth in the Act. The Director would consult with the Board and seek approval before making major policy changes. The Board would approve major budget submissions, investments, and awards. The Board approved the Foundation's annual budget and quadrennial strategic plan,[59] and it was closely consulted on changes to NSF's programs and organizational structure.[60]

48. That all changed when the Trump-Vance Administration took office in January 2025. Since shortly after inauguration day, the administration has taken a series of steps to overhaul

---

years. NSF award #2419464 (2024–2027) combines longitudinal brain-imaging, behavioral, and social-environmental measures to investigate how neural development and social support influence adolescents' transition to adulthood. And NSF award #2605721 (2026–2031), funded through SBE as part of a cross-directorate computational neuroscience program, supports repeated brain-imaging of participants engaging in conversations over an entire year.

[59] *See* Nat'l Sci. Bd., *Committee on Strategy—Charge*, https://perma.cc/Q62S-LLFG (explaining that the Board Committee on Strategy helps carry out "the board's responsibilities to . . . [c]onsult with the director on the 'formulation of programs,'" "[c]onsult with the director on NSF's organizational structure," "[a]pprove NSF's quadrennial strategic plan," and "[a]pprove NSF's annual budget request submission to the Office of Management and Budget"); Memorandum to Nat'l Sci. Bd. Members, *Major Actions and Approvals at the August 15–16, 2023 Meeting*, (Aug. 16, 2023), at 1, https://perma.cc/8WKH-87XP (documenting Board resolution endorsing submission of NSF's proposed fiscal year 2025 budget to OMB).

[60] *See, e.g.*, Nat'l Sci. Bd., *Subcommittee on Technology, Innovation, and Partnerships—Charge*, https://perma.cc/Q62S-LLFG (Board subcommittee dedicated to consulting with NSF regarding the launch of new Directorate created by Congress); Nat'l Sci. Bd., *Approved Minutes, May 1–2, 2024*, (July 24, 2024) at 4–5, https://perma.cc/VP9K-QV7T (consultation concerning new Directorate).

the Foundation—all without consulting the Board. It has taken special aim at the "social, behavioral, and economic sciences," which the White House has derided as "woke."[61]

49. First, on April 18, 2025, NSF changed its policies to forbid grants the administration deems to relate to diversity, equity, and inclusion and terminated over $1 billion in previously awarded grants.[62] The terminations especially impacted the social, behavioral, and economic sciences, which lost 320 grants worth approximately $91 million.[63]

50. The Foundation's Senate-confirmed Director resigned amid the grant terminations, on April 24, 2025.[64] Upon his resignation, NSF designated Defendant Brian Stone, NSF's Chief of Staff, as the official "performing the duties of the Director."[65]

51. Then, in its May 2, 2025 budget request for fiscal year 2026, the administration sought to cut funding for the SBE Directorate by 67 percent.[66] Congress rejected that request. The Senate Committee on Appropriations wrote that it "supports the SBE Directorate and recognizes the fundamental importance of the research it supports in advancing scientific understanding of public health, defense and security, education and learning, and the interface between humans and technology." S. Rep. No. 119-44, at 164 (2025). The Senate Committee's budget proposal provided "not less than the fiscal year 2024 enacted [funding] level for the SBE Directorate." *Id.*

---

[61] Letter from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Hon. Susan Collins, Chair, Sen. Comm. on Appropriations (May 2, 2025), at 38, https://perma.cc/SNX8-2F2N.

[62] Dan Garisto, *Hundreds more NSF grants terminated after agency director resigns*, Nature (Apr. 25, 2025), https://perma.cc/36D3-4TN8; Jeffrey Mervis, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions*, Sci. (May 8, 2025), https://perma.cc/8MYR-H9RM.

[63] Consortium of Soc. Sci. Ass'ns, *NSF Releases List of Terminated Grants,* cossa.org (May 27, 2025), https://perma.cc/W6W9-HQ77.

[64] Nat'l Sci. Found., *Statement by Director Sethuraman Panchanathan on His Departure*, nsf.gov (Apr. 24, 2025), https://perma.cc/2F8M-RVSH.

[65] Nat'l Sci. Found., *NSF FY 2026-2030 Strategic Plan*, nsf.gov, https://perma.cc/TA73-WYSN.

[66] Nat'l Sci. Found., FY 2026 Budget Request to Congress, R&RA 13 (May 30, 2025), https://perma.cc/956A-N2SJ.

52. The final explanatory statement that accompanied the January 2026 appropriation for NSF "directs NSF to equitably distribute funding to support all basic research directorates within R&RA [the Research and Related Activities Account]" and expressly provides that "[n]o directorate shall receive more than a 5 percent reduction relative to the fiscal year 2024 enacted level." 172 Cong. Rec. H265 (daily ed. Jan. 8, 2026) (explanatory statement submitted by Rep. Cole, Chair, H. Comm. on Appropriations, regarding H.R. 6938); *see* Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act, 2026, Pub. L. No. 119-74, div. A, tit. III, 140 Stat. 5, 45 (NSF appropriation).

## IV. Defendants close the SBE Directorate without Board approval

53. Despite Congress's support for the SBE Directorate, NSF decided to close the SBE Directorate. On April 3, 2026, the Foundation announced in its Fiscal Year 2027 budget request that "NSF will close-out the Directorate for Social, Behavioral, and Economic Sciences."[67]

54. Although the agency claimed that "*[c]ontinuing* grants that align with Administration priorities, such as in behavioral and cognitive science, and all impacted employees will be transferred to other parts of the agency," it said nothing about how NSF will fund *future* SBE grants, if at all. It did not even address existing awards that fall outside the administration's limited priorities.[68] Nor did it say which Directorate(s) will service existing grants.[69]

55. On the same day, April 3, 2026, the SBE Directorate held an all-hands staff meeting attended by NSF leadership, including Chief Science Officer Simon Malcomber, Chief of Staff Brian Stone, and Chief Management Officer Micah Cheatham.

---

[67] Nat'l Sci. Found., FY 2027 *Budget Request to Congress*, R&RA 11 (2026), https://perma.cc/U4PA-PAQ5.

[68] *Id.*

[69] *Id.*

56. At the meeting, Foundation leadership announced that unless Congress directed the Foundation to fund the SBE Directorate for fiscal year 2027, SBE would shut down in fiscal year 2027. They explained that absent such congressional direction, the Foundation would reassign all SBE program officers to other Directorates by the end of the year.

57. When a staff member raised that the explanatory material that accompanied last year's congressional appropriation directed NSF not to reduce the Directorate's funding by more than 5 percent, NSF leadership responded that because Congress included that direction in the explanatory material, not the text of the law itself, the administration intended to disregard it.

58. The Foundation's officers did not consult the National Science Board, or even notify it, before deciding to close the SBE Directorate. Indeed, on April 24, 2026, less than three weeks after NSF announced the Directorate's closure, President Trump fired the entire Board.

59. To prepare for SBE's closure, NSF leadership directed Directorate staff to clear the books of its financial commitments, including so-called "mortgages." Often, instead of paying a grant all at once, SBE commits to pay in installments over a period of three to five years—a "mortgage." Because NSF did not expect to fund SBE beyond this year, leadership instructed the Directorate to pay off all outstanding mortgages with the funds allocated for this year. Because SBE set aside tens of millions of dollars to pay mortgages, less money was available to fund new grant awards.

60. NSF leadership also told SBE program officers that, for the remainder of the fiscal year, they were only "allowed" to recommend proposals that fell within the administration's priorities, including artificial intelligence, cognitive neuroscience, and decision-making.

61. This fiscal year, the number of new grants SBE awarded plummeted by 89 percent—from an annual average of 800 grants to only about 87 new awards in fiscal year 2026.

62. In addition, NSF has not issued any new grant solicitations for the SBE Directorate. On August 17, 2026, NSF released 12 solicitations for other Directorates, but none for SBE.[70]

63. NSF has also excluded the SBE Directorate from its graduate and post-doctoral research fellowship programs.[71]

64. On September 29, 2026, the head of the SBE Directorate, Christina Freyman, left SBE to lead another Directorate. NSF has reassigned most or all of the Directorate's permanent staff, and it did not renew the contracts of any of the scientist program officers (called "rotators") who staff the Directorate on assignment from universities.

## V. The dissolution of the SBE Directorate will harm the plaintiffs and devastate research in social, behavioral, and economic sciences

65. The SBE Directorate's closure eliminates the source of approximately 64 percent of federal funding for basic academic research in the social, behavioral, and economic sciences in the United States.[72] The harm to science and scientists is immediate and immeasurable.

66. Dissolving the SBE Directorate wipes out the many substantive programs that previously funded research in the entire range of congressionally mandated disciplines within SBE, removing the established pathways through which scientists nationwide could compete for federal support to advance fundamental knowledge about the human mind, behavior, and society. In doing so, it ends funding opportunities for basic research in the social, behavioral,

---

[70] Nat'l Sci. Found., *August 2026 Notices of Funding Opportunity for Foundational Research* (Aug. 17, 2026), https://perma.cc/4YS3-WVZ3.

[71] Nat'l Sci. Found., *NSF 26-526: NSF Graduate Research Fellowship Program (GRFP): Program Solicitation*, nsf.gov (Aug. 25, 2026), https://perma.cc/5MU2-9RZC; Jeffrey Mervis, *NSF shrinks support for social sciences in prestigious graduate fellowship program*, Sci. (Aug. 26, 2026), https://perma.cc/X5X5-RFMF; Nat'l Sci. Found., *SBE Postdoctoral Research Fellowships (SPRF)*, nsf.gov, https://perma.cc/49TR-R4J5 (listing no pending opportunity).

[72] Nat'l Sci. Found., FY 2023 Budget Request to Congress, SBE-3 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU.

and economic sciences, and it dismantles the infrastructure through which those grants were solicited, reviewed, and funded.

67. Without the SBE Directorate, most psychologists, sociologists, economists, linguists, and neuroscientists have nowhere to go to obtain funding for their work. Now, fundamental research in the SBE sciences cannot meaningfully compete for new NSF funding unless it falls within the scientific mission of another Directorate. Most basic social science research does not. The Directorates for Biological Sciences, Computer and Information Science and Engineering, Engineering, Geosciences, and Mathematical and Physical Sciences focus on fundamental research in their respective scientific and engineering disciplines, rather than the study of human behavior and social and economic institutions. The Directorate for STEM Education primarily supports applied research on STEM education, teaching, and learning, while the Directorate for Technology, Innovation, and Partnerships focuses on technological use-inspired research and the translation of scientific discoveries into industry applications. None provides a comparable funding home for the vast majority of fundamental SBE research.

68. Even when a social science project overlaps with another Directorate's subject matter, it most often requires fundamental changes to compete for funding in another Directorate, with a lower chance of success. And the proposal would face a review process that lacks the SBE-specific expertise needed to properly evaluate the proposal's scientific merit.

69. Nor can sources outside NSF fill the gap. As the Senate Committee noted when it passed the NSF Act, private companies focus on immediate, money-making applications, not the basic research needed to build later applications. And other federal agencies that fund research, like the National Institutes of Health (which focuses on clinical applications to specific conditions and diseases), do not typically fund basic research in social sciences.

70. SBE's closure directly affects the Plaintiffs. The scientist members of SESP, SANS, and FABBS's other member societies rely heavily on the SBE Directorate for research funding. Collectively, their members have received hundreds, likely thousands, of grants from the SBE Directorate and have hundreds of grant proposals that are pending with the SBE Directorate—or were pending before NSF decided to shut it down. Several of Plaintiffs' members submitted applications for SBE grants that received highly competitive peer-review ratings and were even recommended by program officers for funding. But after NSF made the decision to close SBE, those researchers' applications were rejected as a result.

71. The harms to these scientists and their scientific research, and to science itself, will be irreparable. Without their central source of funding, these researchers cannot pursue their work. This threatens to stunt not only their careers, but also the vital research to which they have dedicated years of their lives.

**A. Harm to Time-Sensitive Research**

72. First, the research the Plaintiff Societies and their members conduct is time-sensitive. As time passes, scientists lose the opportunity to collect key data—like political and social sentiments leading up to an election, natural disasters, or the effects of rapidly evolving technologies on human behavior—that can only be measured in real time. Once the window closes, researchers lose critical insights.

73. For example, two professors who belong to one of FABBS's member societies study how artificial intelligence (AI) affects human behavior. Right now, they have a unique opportunity to observe how people initially develop relationships with a fundamentally new form of social agent, and how their social cognition changes as those interactions become routine. But once these initial experiences have passed, they cannot be experimentally or observationally reconstructed. Because these tools, and the way people use them, are changing

quickly, a delay of a year or more costs the research crucial observations that cannot be collected later. Both scientists have applied to the SBE Directorate to fund their research, but because the Directorate has closed, they cannot conduct their time-sensitive research. Meanwhile, their window shrinks by the day.

74. What's more, changes in technologies, science, and society can overtake a scientist's research and diminish its value. A scientist's research may have the most impact at particular forks in the road for the development of technologies, systems, or policies. Once those systems and practices are in place, they are hard to change, and the problems the research investigates become harder to correct. So the scientist's work loses value and can even become obsolete. Consider the use of AI in education. Without proper guidance, many students have used AI inappropriately—to do their homework, for example—in ways that harm learning. As a result, many have concluded that AI has no place in education. Behavioral scientists, including Plaintiffs' members, hypothesize many ways in which teachers can effectively use AI to revolutionize learning. But as resistance to its use becomes more ingrained in school systems, these scientists' findings will become harder to implement. The same path dependency exists in software development and industry, where models and practices can calcify once they take hold.

**B. Harm to Scientists' Careers**

75. Delays in funding harm scientists' careers in ways they cannot repair. The old adage, "publish or perish," is as true as ever in academia. For every month that a scientist cannot conduct their core research, they lose time they would spend conducting experiments, publishing their results, presenting at conferences, and building collaborations and professional networks, stalling their careers. Some have had to dramatically shrink or even shutter their labs.

76. The closure falls hardest on SANS's trainee members, who constitute 72 percent of the organization's membership, and early-career researchers like Jenna Croteau. The closure cuts

them off from time-sensitive steps in their careers. NSF's Directorates fund fellowships for graduate and postdoctoral research that are prerequisites to academic jobs in many social science fields. But due to SBE's closure, NSF's 2026 Graduate Research Fellowship solicitation excluded SBE from the list of participating directorates, and SBE has no open solicitations for postdoctoral fellowships even though other Directorates do. Dr. Croteau has promising proposals for a postdoctoral fellowship that would have fit SBE's criteria, but now that SBE is closing, it will not give her funding. And because graduates are only eligible for postdoctoral fellowships for three years after graduation, her window is rapidly closing.

77. The loss of funding for graduate and postdoctoral students also harms more senior researchers, who must offer fewer positions, postpone recruitment, or shorten appointments in their labs, losing promising students and fellows who accept other jobs and cannot be recruited later. FABBS, SANS, and SESP member Jonathan Freeman will need to let a postdoctoral researcher in his lab go on July 1, 2027, without SBE funding. The researcher previously applied for an SBE postdoctoral fellowship and had planned to revise and resubmit the proposal. However, the closure of the fellowship program has eliminated that opportunity, and the researcher's eligibility window will expire in 2027, permanently foreclosing the chance to secure this critical support and potentially bringing his academic research career to a premature end.

78. Early-career faculty, including Plaintiffs' members, are on fixed tenure timelines, and losing opportunities to secure their first independent grants damages their tenure prospects. Funding that arrives later cannot add delayed data, publications, or trained personnel to the record that those reviews consider. Dr. Sparkman, a non-tenured professor, needs to generate outside funding to obtain tenure. He submitted a grant application to the SBE Directorate, but it was denied after SBE announced its impending closure, and because SBE has no active

solicitations, he cannot resubmit a modified version or submit any new proposals. The loss of the SBE Directorate has put Dr. Sparkman's and other society members' careers in jeopardy.

79. The SBE Directorate's CAREER awards, which are prestigious NSF awards for early-career faculty, have been a critical path to an independent research career. Beyond providing five years of significant research support, a CAREER award helps build a young scientist's research program and lab, supports graduate students, and brings academic recognition. Prestigious external funding of this kind may also carry considerable weight when universities evaluate junior faculty for tenure and promotion. CAREER awards are restricted to early-career faculty, which means there is a narrow window of eligibility for junior professors. With the closure of the SBE Directorate, Plaintiffs' early-career members lose access to this opportunity.

**C. Disruptions to Ongoing Longitudinal Research**

80. The closure of the SBE Directorate threatens to irreparably disrupt research that SBE is currently funding, including longitudinal studies that must apply to renew their grants to sustain their research and avoid fatal gaps in data collection. It threatens to wipe out the shared scientific research resources that SBE funds, including the "big three" gold-standard social science surveys relied on by scientists around the country for decades. According to the head of the General Social Survey, "Future NSF funding for the GSS has not yet been determined, and there is currently no available NSF opportunity for the next cycle."[73] American National Election Studies (ANES), the nation's longest-running continuous series of survey data on American political attitudes, public opinion, and voting behavior, will shutter if it does not receive funding

[73] Dan Garisto, *US Social Sciences Face Existential Crisis After NSF Cuts*, Nature (Nov. 3, 2026), https://perma.cc/U3S3-MDRJ.

by February.[74] It is difficult to overstate the devastation the loss of these surveys will wreak on social science research. Numerous SESP members rely on these surveys to perform their work.

81. Time-sharing Experiments for the Social Sciences (TESS), an SBE-funded project which ran researchers' experiments free of charge on nationally representative samples, was funded through SBE's Social Psychology program, and has had to suspend operations. This suspension has disrupted the ongoing work of TESS's principal investigator, a SESP member, and removed a key resource on which SESP members and many other social scientists rely.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the APA, 5 U.S.C. § 706(2)(A), (D)<br>Contrary to Law and Required Procedures<br>(Lack of Board Approval or Consultation)

82. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

83. A court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

84. The National Science Foundation is an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

85. The closure of the SBE Directorate is a final agency action subject to judicial review under the APA. *See* 5 U.S.C. § 704. It "mark[s] the consummation of the [NSF's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).

86. ***Major Policymaking without Board Approval***. The NSF Act reserves for the Board the power to "establish the policies of the Foundation," including the prerogative to approve or

[74] *Id.*

disapprove major changes to the Foundation's structure and grantmaking process. 42 U.S.C. § 1863(a); *see also id.* § 1864(e)(1). The elimination of the SBE Directorate, which provides almost $250 million in awards per year and funds most of the nation's basic academic research in the social, behavioral, and economic sciences, is a major change to NSF policy that required Board approval. But the Board did not approve the closure of the SBE Directorate.

87. ***Elimination of a Division or Program without Board Consultation***. The NSF Act expressly requires the Director to consult with the Board before eliminating divisions or programs. *See* 42 U.S.C. § 1866 ("There shall be within the Foundation such Divisions as the Director, *in consultation with the Board*, may from time to time determine." (emphasis added)); *id.* § 1864(d) ("The formulation of programs in conformance with the policies of the Foundation shall be carried out by the Director *in consultation with the Board*." (emphasis added)). But Foundation leadership did not consult the Board regarding the decision to eliminate the SBE Directorate.

88. As discussed earlier, Congress has also expressly directed NSF to "support research on labor market analysis innovations, data and information sciences, electronic information tools and methodologies, and metrics" "working through the Directorate of Social, Behavioral & Economic Sciences." Pub. L. No. 115-402, § 4(a), 132 Stat. 5346 (codified at 42 U.S.C. § 1862p, note). The closure of the Directorate violates that requirement.

89. The decision to close SBE thus violated the NSF Act. Accordingly, it is contrary to law and without observance of required procedures, in violation of the APA, 5 U.S.C. § 706(2).

**COUNT II**
**Violation of the APA, 5 U.S.C. § 706(2)(A), (D)**
**Contrary to Law and Required Procedures**
**(Violation of the Federal Vacancies Reform Act)**

90. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

91. The Federal Vacancies Reform Act (FVRA) describes the circumstances in which agency officials may temporarily serve as principal officers. 5 U.S.C. §§ 3345–3346. It is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency for which appointment is required to be made by the President, by and with the advice and consent of the Senate." *Id.* § 3347(a).

92. The National Science Foundation Act requires Presidential appointment and Senate confirmation for the office of the Director. 42 U.S.C. § 1864.

93. "The FVRA authorizes three classes of Government officials to become acting officers." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017). "The general rule is that the first assistant to a vacant office shall become the acting officer." *Id.* "The President may override that default rule by directing either a person serving in a different [President-appointed, Senate-confirmed] office or a senior employee within the relevant agency to become the acting officer instead." *Id.* "[O]nly the President" may direct an agency employee other than the "first assistant" to serve as an acting agency head without Senate confirmation. 5 U.S.C. § 3345(a).

94. If a person is not authorized to perform the duties of an office under the FVRA, "[a]n action taken" by that person "in the performance of any function or duty of [the] vacant office . . . shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d)(1)–(2).

95. Under the NSF Act, only "the Director," "in consultation with the Board," may determine, create, or eliminate divisions of the Foundation. 42 U.S.C. § 1866.

96. Neither Defendant Brian Stone nor anyone else was properly authorized to act as the Director when the decision to eliminate the SBE Directorate was made. By statute, the Director's "first assistant" (5 U.S.C. § 3345(a)(1)) is the "Deputy Director" of NSF, 42 U.S.C. § 1864a, not the Chief of Staff, and there was no Deputy Director when the Senate-confirmed Director

resigned on April 24, 2025. Thus, Brian Stone could only serve as the Acting Director if the President had designated him to serve in that role. 5 U.S.C. § 3345(a)(2)–(3).

97. On information and belief, however, the President did not direct Brian Stone to serve as the Acting Director of NSF. NSF has not claimed that the President issued such a directive, and the agency does not refer to Stone as the Acting Director, as agencies typically do when an official is designated as an acting head under the FVRA. Instead, it has referred to Stone as simply "the Chief of Staff performing the duties of the Director," a phrase agencies use when an official is acting pursuant to an internal agency delegation rather than a Presidential directive.[75]

98. Because Brian Stone was not authorized to act as the Director of NSF under the FVRA, his decision to eliminate the SBE Directorate is void. *See* 5 U.S.C. § 3348(d)(1)–(2).

## COUNT III

### Violation of the APA, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

99. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

100. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary," "capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

101. An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*

[75] Anne Joseph O'Connell, Admin. Conf. of the U.S., *Acting Agency Officials and Delegations of Authority* 11 (2019), https://perma.cc/4FCS-7WEL ("In the first year of an Administration, one sees a lot of 'acting' titles on agency websites. After the Act's time limits run out, one sees 'performing the functions of [a particular vacant office]' language instead."); *id.* at 63 ("Agencies seem to have coalesced on the relevant wording for those carrying out [internally] delegated functions: 'performing the duties of [fill in Senate-confirmed position].'").

*of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). A decision violates the APA if it "failed to consider an important aspect of the problem." *Id.* When an agency repeals an existing policy, it must also provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," including any "reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). It must also consider "alternatives that are within the ambit of the existing policy." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (cleaned up).

102. The decision to close the SBE Directorate violated these standards. Among other things, NSF failed to consider multiple important aspects of the problem, including the predictable effects on NSF's ability to fulfill its statutory obligation to "initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the . . . social . . . sciences," 42 U.S.C. § 1862(a), and to support research in specific subjects in the social, behavioral, and economic sciences, as NSF's mandates require. *See supra* note 43; 42 U.S.C. §§ 1862u, 1862v, 1862w, 19055, 19056, 19066, 19070. Defendants failed to explain how NSF would meet those mandates without the division that has served that purpose for the last 35 years. Indeed, if allowed to proceed, the dissolution of the SBE Directorate would mark the first time since at least 1957 that NSF will not have a program or division focused on the social, behavioral, or economic sciences.

103. Defendants did not consider any alternatives to closing the entire SBE Directorate. *See Regents of the Univ. of Cal.*, 591 U.S. at 30 (agency must consider such alternatives).

104. Nor did Defendants consider the reliance interests of academic institutions and scientists who regularly apply for funding through the SBE Directorate and depend on its availability to carry out their research and maintain their livelihoods, or the many constituents who benefit from that research. Universities and researchers have invested in specialized

research infrastructure, recruited and trained personnel, and developed long-term scientific programs in reliance on NSF's established, recurring mechanisms for funding basic SBE research. And researchers across the country—including the Plaintiff societies' members—have relied for decades on the "big three" longitudinal surveys that the SBE Directorate sustains. Defendants failed to assess the consequences of dismantling that infrastructure or consider measures to mitigate the disruption of these longstanding investments and research programs.

105. Defendants also failed to explain how NSF could accomplish its mandate to support research "working through the Directorate of Social, Behavioral & Economic Sciences" after eliminating the Directorate. Pub. L. No. 115-402, § 4(a), 132 Stat. 5346 (codified at 42 U.S.C. § 1862p, note). The failure to consider how the closure would affect compliance with this obligation constitutes yet another failure to consider an important aspect of the problem.

106. The decision to dissolve the SBE Directorate was therefore "arbitrary," "capricious," and an "abuse of discretion" under the APA. 5 U.S.C. § 706(2)(A).

**COUNT IV**
**Ultra Vires Action**

107. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

108. Under the *ultra vires* doctrine, a court may enjoin agency action taken "entirely in excess of [the agency's] delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up).

109. The NSF Act prohibits NSF from eliminating a division or program without consulting the Board. *See* 42 U.S.C. §§ 1863(a), 1864(d), 1866. By dismantling the SBE Directorate without such consultation, Defendants acted "in excess of [their] delegated powers and contrary to a specific prohibition in the Act." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958); *see Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 974–80 (D.C. Cir. 2022) (holding that complaint stated claim that agency acted ultra vires by failing to consult as required by statute).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare that the closure of the SBE Directorate violates the National Science Foundation Act of 1950, as amended, and the APA;

b. Stay, vacate, and set aside the closure of the SBE Directorate;

c. Preliminarily and permanently enjoin Defendants from implementing the decision to close the SBE Directorate;

d. Preliminarily and permanently enjoin Defendants to continue soliciting funding opportunities, reviewing applications, and awarding grants through the SBE Directorate according to NSF's established processes and criteria;

e. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements deemed appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

November 9, 2026

Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette
Sriram Sridharan*
Lesley Farby*
Robin F. Thurston*
Democracy Forward
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
souellette@democracyforward.org

*Counsel for Plaintiffs*

* Motion to appear pro hac vice forthcoming