**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MASSACHUSETTS**

FEDERATION OF ASSOCIATIONS IN BEHAVIORAL & BRAIN SCIENCES, *et al.*,

*Plaintiffs*,

v.

NATIONAL SCIENCE FOUNDATION, *et al.*,

*Defendants*.

Case No. 1:26-cv-15015-NMG

**Leave to file excess pages granted on November 17, 2026**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY UNDER SECTION 705 OF THE APA AND FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .......... 1

BACKGROUND .......... 3

I. Congress created NSF and made the Board its governing body. .......... 3

II. NSF has long maintained a social science division to meet its statutory mandates. .......... 4

III. NSF shut down the SBE Directorate without consulting the Board. .......... 6

IV. The closure will devastate the social sciences and harm the Plaintiffs. .......... 8

ARGUMENT .......... 10

I. Plaintiffs are likely to succeed on the merits. .......... 11

A. The decision to close the SBE Directorate violates the NSF Act and the APA. .......... 11

i. The decision to close the Directorate is a final agency action. .......... 11

ii. The closure decision violates the statutes that govern NSF. .......... 13

iii. The closure decision violates the Federal Vacancies Reform Act. .......... 13

iv. The closure is arbitrary and capricious. .......... 15

B. The decision to close the SBE Directorate is *ultra vires*. .......... 16

II. The closure of the SBE Directorate irreparably harms Plaintiffs and their members .......... 16

A. The SBE Directorate's closure forecloses time-sensitive research. .......... 17

B. The closure disrupts ongoing studies. .......... 19

C. The closure inflicts lasting harm on Plaintiffs' members' careers. .......... 21

D. The closure dismantles irreplaceable research infrastructure. .......... 23

III. The balance of equities and public interest favor relief. .......... 25

IV. The Court should stay the closure and issue a preliminary injunction. .......... 26

CONCLUSION .......... 27

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) .......... 11

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
145 F.4th 39 (1st Cir. 2025) .......... 21, 25

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 27

*Ass'n of Am. Univs. v. Dep't of Energy*,
789 F. Supp. 3d 118 (D. Mass. 2025) .......... 19

*Ass'n of Am. Univs. v. Nat'l Sci. Found.*,
788 F. Supp. 3d 106 (D. Mass. 2025) .......... 19, 20

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 11, 12

*California v. Trump*,
840 F. Supp. 3d 37 (D. Mass. 2026) .......... 27

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) .......... 15

*Campanale & Sons, Inc. v. Evans*,
311 F.3d 109 (1st Cir. 2002) .......... 13

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 15, 16

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) .......... 27

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) .......... 26

*L.M.-M. v. Cuccinelli*,
442 F. Supp. 3d 1 (D.D.C. 2020) .......... 14

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 26

*Liu v. Noem*,
780 F. Supp. 3d 386 (D.N.H. 2025) .......... 22

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
No. 26-cv-30117-MJJ, 2026 WL 2521944 (D. Mass. Aug. 26, 2026) .......... 19

*Massachusetts v. Dep't of Educ.*,
828 F. Supp. 3d 198 (D. Mass. 2026) .......... 10

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025),
*aff'd*, 164 F.4th 1 (1st Cir. 2026) .......... 19, 25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 15

*Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*,
26 F.4th 960 (D.C. Cir. 2022) .......... 16

*Neguse v. ICE*,
813 F. Supp. 3d 45 (D.D.C. 2025) .......... 26

*New York v. Kennedy*,
155 F.4th 67 (1st Cir. 2025) .......... 12

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) .......... 16

*NuVasive, Inc. v. Day*,
954 F.3d 439 (1st Cir. 2020) .......... 17

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 15

*Ozturk v. Trump*,
819 F. Supp. 3d 45 (D. Mass. 2025) .......... 22

*Rhode Island v. Trump*,
155 F.4th 35 (1st Cir. 2025) .......... 17, 20

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I. 2025) .......... 23, 24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
102 F.3d 12 (1st Cir. 1996) .......... 17

*Thakur v. Trump*,
176 F.4th 1187 (9th Cir. 2026) .......... 23

*Thakur v. Trump*,
800 F. Supp. 3d 1044 (N.D. Cal. 2025)....................22

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)....................11

*Univ. Corp. for Atmospheric Rsch. v. Nat'l Sci. Found.*,
No. 1:26-cv-01061, 2026 WL 2533392 (D. Colo. June 1, 2026)....................11, 23

*Venezuelan Ass'n of Mass. v. USCIS*,
No. 26-13038-NMG, 2026 WL 2255272 (D. Mass. Aug. 5, 2026)....................10, 26

*Widakuswara v. Lake*,
779 F. Supp. 3d 10 (D.D.C. 2025)....................12

*Widakuswara v. Lake*,
832 F. Supp. 3d 55 (D.D.C. 2026)....................14

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026)....................17, 20, 26, 27

**Statutes**

5 U.S.C. § 705....................10, 26, 27

5 U.S.C. § 706(2)....................11, 14, 15

5 U.S.C. § 3345....................2, 13, 14, 16

5 U.S.C. § 3347(a)....................13

5 U.S.C. § 3348(d)....................14

42 U.S.C. § 1861....................3

42 U.S.C. § 1862(a)....................2, 3, 4, 15

42 U.S.C. § 1862p note....................5, 13

42 U.S.C. § 1862u....................5, 15

42 U.S.C. § 1862v....................5, 15

42 U.S.C. § 1862w....................5, 15

42 U.S.C. § 1863....................3

42 U.S.C. § 1864....................3, 13

42 U.S.C. § 1864a ........ 14

42 U.S.C. § 1866 ........ 2, 4, 13, 16

42 U.S.C. § 19055 ........ 5, 15

42 U.S.C. § 19056 ........ 5, 15

42 U.S.C. § 19066 ........ 5, 15

42 U.S.C. § 19070 ........ 5, 15

Pub. L. No. 115-402, 132 Stat. 5346 (2018) ........ 5, 13

**Rules**

Fed. R. Civ. P. 65 ........ 27

**Regulations**

Resolution NSB-2017-5: Delegation of Award-Approval Authority to the Director, 82 Fed. Reg. 12129 (Feb. 28, 2017) ........ 4

**Legislative Materials**

172 Cong. Rec. H265 (daily ed. Jan. 8, 2026) ........ 6

S. Comm. on Appropriations, 119th Cong., *Explanatory Statement for Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2027* (2026) ........ 25–26

S. Rep. No. 81-90 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 2269 ........ 3

S. Rep. No. 119-44 (2025) ........ 1, 6, 25

**Other Authorities**

Anne Joseph O'Connell, Admin. Conf. of the U.S., *Acting Agency Officials and Delegations of Authority* (Dec. 1, 2019), https://perma.cc/4FCS-7WEL ........ 14

*Black's Law Dictionary* (7th ed. 1999) ........ 13

## INTRODUCTION

The National Science Foundation's Directorate for Social, Behavioral, and Economic Sciences (SBE) provides almost two thirds of federal funding for basic research in the social, behavioral, and economic sciences in the United States. The SBE sciences encompass fields that study human behavior and socioeconomic systems, from economics and political science to psychology and neuroscience. As Congress has recognized, these fields are of "fundamental importance" to "advancing scientific understanding of public health, defense and security, education and learning, and the interface between humans and technology." S. Rep. No. 119-44, at 164 (2025). SBE research has transformed economic policy, inspired the models behind Google's search engine, improved the way doctors match kidney donors with patients, and helped mitigate the opioid crisis, the spread of diseases like Ebola and COVID-19, and evolving threats posed by cyberhackers and terrorist networks in the United States and abroad. Economists funded by the SBE Directorate "dominate the roster" of Nobel laureates in economics.[1]

Last year, the Trump-Vance Administration deemed all these fields "woke." So on April 3, 2026—without an appointed Director and without consulting NSF's governing body, the National Science Board—NSF announced that it would unilaterally "close-out" the SBE Directorate. Since the April 3 decision, the agency has stopped funding opportunities for basic research in the social, behavioral, and economic sciences, released the scientists who work in the Directorate on assignment from universities, and reassigned most of the Directorate's permanent staff.

NSF's decision to dissolve the SBE Directorate will devastate the social, behavioral, and economic sciences. Without the nation's primary source of funding for those sciences, hundreds

[1] France A. Córdova, Foreword to Vannevar Bush, *Science: The Endless Frontier, 75th Anniversary Edition*, NSF at v (2021), https://perma.cc/8BTD-4TMS; NSF, *NSF-Supported Researchers Honored with 2026 Nobel Prizes* (Oct. 14, 2026), https://perma.cc/V4VE-KQW5 (noting that NSF has funded 75 Nobel laureates in economics).

of promising research projects directed to the pressing problems of our time—from the use and effects of artificial intelligence to child development in the age of social media—will never proceed. Early-career scientists will have no realistic path to funding for the fellowships on which generations of scientists have relied to launch their careers. And the nation's largest and longest-running social surveys, used by researchers around the country, will shutter without funding.

The Directorate's shutdown is not only devastating; it is illegal for at least three reasons.

*First*, under NSF's governing statute, "the Director" may only eliminate an NSF "Division[]" "in consultation with the Board." 42 U.S.C. § 1866. But NSF's leadership did not even notify the Board before it decided to close the SBE Directorate. Indeed, just weeks after NSF shut the Board out of that decision, the President summarily fired the entire Board.

*Second*, NSF did not even have a Director when it decided to close SBE. Nearly a year earlier, the Senate-confirmed Director resigned, and the official who purportedly took his place—NSF Chief of Staff Brian Stone—was neither the "first assistant" to the Director nor "direct[ed]" by the "President" to fill that role, as the Federal Vacancies Reform Act (FVRA) requires. 5 U.S.C. § 3345. So even if the "Director" could close the Directorate without consulting the Board, 42 U.S.C. § 1866, Defendant Stone was not authorized to make that decision.

*Third*, NSF has not provided any public explanation for the Directorate's closure, let alone any reason to think NSF can fulfill its statutory mandates to support the "social . . . sciences," 42 U.S.C. § 1862(a)(1), or fund specific congressionally directed fields of research, *see infra* note 2, without the division that exists for that purpose. Nor did the agency consider the effects of SBE's closure on the scientists or the sciences that have long relied on it.

NSF cannot shut down the government's largest source of funding for an entire scientific sector without a Director and without consulting the body Congress created to make such decisions. And it certainly cannot do so with no explanation. The closure of the SBE Directorate

violates NSF's governing statutes and the Administrative Procedure Act (APA). The Court should stay the decision to close the Directorate and enjoin Defendants to restore it.

## BACKGROUND

### I. Congress created NSF and made the Board its governing body.

Congress created NSF in the aftermath of World War II, to meet the "Nation-wide demand" to "stimulat[e] American research in the basic sciences" and fill the "grave need for more trained scientists in America." S. Rep. No. 81-90 (1949), *as reprinted in* 1950 U.S.C.C.A.N. 2269, 2270. On the brink of the Cold War, Congress recognized that while private industry was "well equipped" to advance the "applied sciences," it had less incentive to fund basic science: "'the discovery of fundamental new knowledge and basic scientific principles'" on which practical solutions are built. *Id.* (quoting Vannevar Bush, *Science: The Endless Frontier* (1945)). Without that foundational research, Congress feared the United States would lose the "'race for innovation'" and its place on the world stage. *Id.* at 2271 (quoting Bush, *supra*).

To close that gap, the NSF Act directs NSF to "initiate and support basic scientific research and programs . . . at all levels in the mathematical, physical, medical, biological, social, and other sciences." 42 U.S.C. § 1862(a)(1). To steward that project, Congress created the National Science Board, a 25-member body of "eminent" scientific leaders "selected solely on the basis of established records of distinguished service" to represent the "views of scientific and engineering leaders in all areas of the Nation." *Id.* § 1863(c). The Board is, by definition, a cornerstone of the agency, which "shall consist of [the] National Science Board . . . and a Director," *id.* § 1861, who is "appointed by the President, by and with the advice and consent of the Senate," *id.* § 1864(a).

From the start, Congress vested the Board with the prerogative to "establish the policies of the Foundation." *Id.* § 1863(a). The Director administers NSF's programs "in consultation with the Board" and "in conformance with the policies" the Board sets. *Id.* § 1864(d). While the Board has

delegated to the Director the power to make most awards below a monetary threshold, 82 Fed. Reg. 12129 (Feb. 28, 2017), the Board retains the authority to "set policies related to awards," NSF, *NSB Committees* (Aug. 8, 2025), https://perma.cc/U6GT-QWSM, and to approve or disapprove agency actions that involve amounts over the threshold, 82 Fed. Reg. at 12129.

Most pertinent here, the Director may determine which "Divisions" "shall be within the Foundation" only "in consultation with the Board." 42 U.S.C. § 1866.

Until 2025, the Foundation followed the decision-making structure set forth in the Act. The Director would seek Board approval before making major policy changes, and the Board was closely consulted on changes to NSF's programs and organizational structure. *See* Ex. 1, Stassun Decl. ¶¶ 5–6; Ex. 2, Phillips Decl. ¶¶ 6–7. Indeed, the Board had an entire committee charged to help carry out "the board's responsibilities to . . . [c]onsult with the director on the 'formulation of programs,'" and "[c]onsult with the director on NSF's organizational structure." Nat'l Sci. Bd., *Committee on Strategy—Charge*, NSF (Aug. 8, 2025), https://perma.cc/Q62S-LLFG.

**II. NSF has long maintained a social science division to meet its statutory mandates.**

NSF's core statutory mandate requires it to support the "social" sciences, among others. 42 U.S.C. § 1862(a)(1). Social science is the study of human behavior, social organizations, and economic systems, including psychology, sociology, and political science as well as economics, linguistics, neuroscience, and statistics. Over the last century, research in those sciences has driven advances in nearly every domain of human society, from healthcare, education, and national security, to "the creation of jobs and industries," to the use of "emerging technologies such as artificial intelligence (AI)." NSF, *FY 2026 Budget Request* at R&RA 13 (May 30, 2025), https://perma.cc/A3JV-VB63; *see* Compl. ¶ 31 (summarizing contributions across contexts); Nat'l Acads. of Scis., Eng'g, & Med., *The Value of Social, Behavioral, and Economic Sciences to National Priorities: A Report for the National Science Foundation*, Nat'l Academies Press at 5–9

(2017), https://perma.cc/6ZUL-2LBW (same); Ex. 3, Baron Decl. ¶¶ 9–10.

Beyond the core mandate, federal statutes require NSF to fund specific research in these sciences, including on opioid addiction, human trafficking, suicide prevention, and the impacts of inflation.[2] Indeed, one statute specifically directs NSF to "support research on labor market analysis innovations, data and information sciences, electronic information tools and methodologies, and metrics" "working through the Directorate of Social, Behavioral & Economic Sciences." Pub. L. No. 115-402, § 4(a), 132 Stat. 5346 (2018) (codified at 42 U.S.C. § 1862p, note).

The SBE Directorate is the only NSF division designed to channel funds to meet those mandates. NSF has maintained a component dedicated to social sciences for almost 70 years. NSF, *8th Annual Report*, at 41 (1958), https://perma.cc/9JH7-DTLP. Today, NSF is organized into eight major divisions, called "Directorates." NSF, *Our Directorates and Offices* (Oct. 23, 2026), https://perma.cc/6RR3-YXTC. The SBE Directorate has managed grants in those fields since 1991, when a scientific task force recommended that NSF create that Directorate. The task force found that as the social sciences had evolved, they had come to play too "important" a "role in formulating the solutions to virtually every major problem facing humankind" to be without a

[2] *See* 42 U.S.C. § 19055 (requiring the Director to "solicit proposals for social, behavioral, and economic science researchers to participate in cross-cutting and interdisciplinary programs" and "ensure social, behavioral, and economic science researchers are represented on relevant merit review panels for such activities"); *id.* § 19066 (requiring funding for research on "social media and consumer technology access and use patterns and related mental health, behavioral, and substance use disorder issues"); *id.* § 19070 (research into the "impact of inflation"); *id.* § 1862u (research on "the science of opioid addiction"); *id.* § 1862v ("fundamental research with potential relevance to suicide, including potential relevance to prevention and treatment, including" research on human behavior, cognition, and development); *id.* § 1862w ("research on the impact of online social media platforms on the maintenance or expansion of human trafficking," including "social and behavioral research related to social media platform users who engage with those promoting or involved in human trafficking"); *id.* § 19056 ("research and development of data, models, indicators, and associated analytical tools to improve our understanding of the impacts of Federally funded research on society, the economy, and the workforce, including domestic job creation").

specific directorate dedicated to those fields. NSF, *NSF Report No. NSF 91-68—Adapting to the Future* (Nov. 2, 1991), https://perma.cc/A47Q-DP77.

Since 1991, the SBE Directorate has grown to provide almost two thirds of federal funding for basic academic research in the social, behavioral, and economic sciences in the United States, distributing an average of approximately $247 million in grant funding per year. NSF, *FY 2023 Budget Request to Congress* at SBE-3 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU.

**III. NSF shut down the SBE Directorate without consulting the Board.**

When the Trump-Vance Administration took office, it deemed the "social, behavioral, and economic sciences" "woke." Letter from Russell T. Vought, Dir., Off. of Mgmt. & Budget, to Hon. Susan Collins, Chair, S. Comm. on Appropriations (May 2, 2025), at 38, https://perma.cc/SNX8-2F2N. Its first budget request sought to cut funding for the SBE Directorate by 67 percent. NSF, *FY 2026 Budget Request* at R&RA 13 (May 30, 2025), https://perma.cc/A3JV-VB63. Congress rejected that request. The Senate Appropriations Committee wrote that it "supports the SBE Directorate and recognizes the fundamental importance of the research it supports in advancing scientific understanding of public health, defense and security, education and learning, and the interface between humans and technology." S. Rep. No. 119-44, at 164 (2025). In the explanatory statement that accompanied the 2026 appropriation, Congress directed that "[n]o directorate shall receive more than a 5 percent reduction relative to the fiscal year 2024 enacted level." 172 Cong. Rec. H265 (daily ed. Jan. 8, 2026).

By April 3, 2026, NSF had decided to ignore that direction and close the SBE Directorate entirely. That day, NSF leadership called SBE staff to an all-hands meeting and told them that the SBE Directorate would shut down in fiscal year 2027. Ex. 4, O'Connor Decl. ¶¶ 13–15; Ex. 5, Nagle Decl. ¶¶ 9–10. NSF's Fiscal Year 2027 budget request to Congress reflected that decision, announcing that NSF "will close-out" the SBE Directorate. NSF, *FY 2027 Budget Request* at

R&RA 11 (Apr. 3, 2026), https://perma.cc/U4PA-PAQ5.

The Foundation's officers did not consult the National Science Board, or even notify it, before deciding to close the SBE Directorate. Ex. 1, Stassun Decl. ¶ 13; Ex. 2, Phillips Decl. ¶ 11. Indeed, on April 24, 2026, three weeks after NSF announced the Directorate's closure, President Trump fired the entire Board. Ex. 1, Stassun Decl. ¶ 14; Ex. 2, Phillips Decl. ¶ 12.

To prepare for SBE's closure, NSF leadership directed Directorate staff to clear SBE's books by paying off multi-year grants that NSF had previously planned to pay in installments over the next few years. Ex. 4, O'Connor Decl. ¶ 17; Ex. 5, Nagle Decl. ¶ 13. Leadership also told SBE staff that NSF would reassign most or all of the Directorate's permanent staff and would not renew the contracts of any of the scientist program officers (called "rotators") who staff the Directorate on assignment from universities. Ex. 5, Nagle Decl. ¶¶ 12, 17.

Since the April 3 decision, NSF has not issued any new grant solicitations for SBE, even after it released 12 solicitations for other directorates on August 17, 2026. Ex. 5, Nagle Decl. ¶ 15; Ex. 4, O'Connor Decl. ¶ 22; NSF, *August 2026 Notices of Funding Opportunity for Foundational Research*, (Aug. 17, 2026), https://perma.cc/4YS3-WVZ3.[3] NSF has also excluded the SBE Directorate from its graduate and post-doctoral fellowship programs.[4]

Although NSF's budget request claimed that certain "[c]ontinuing grants that align with Administration priorities" and "all impacted employees" would "be transferred to other parts of the agency," it said nothing about how NSF will fund *future* grants in the social sciences. NSF, *FY*

[3] NSF, *Find Funding*, https://www.nsf.gov/funding/opportunities?query=SBE&sort=search_api_relevance_DESC/ (last visited Nov. 16, 2026) (search results for "SBE").

[4] NSF, *NSF Graduate Research Fellowship Program (GRFP): Program Solicitation*, NSF 26-526 (Aug. 25, 2026), https://perma.cc/5MU2-9RZC; Jeffrey Mervis, *NSF shrinks support for social sciences in prestigious graduate fellowship program*, *Science* (Aug. 26, 2026), https://perma.cc/X5X5-RFMF; NSF, *SBE Postdoctoral Research Fellowships (SPRF)* (Oct. 15, 2026), https://perma.cc/49TR-R4J5 (listing no pending opportunity).

*2027 Budget Request*, at R&RA 11 (2026), https://perma.cc/U4PA-PAQ5. Nor did it address existing awards that fall outside the administration's limited priorities. *Id.*

**IV. The closure will devastate the social sciences and harm the Plaintiffs.**

The consequences for social, behavioral, and economic sciences are immediate and irreparable. Without the SBE Directorate, most psychologists, sociologists, economists, linguists, and neuroscientists have nowhere to go to obtain funding for their work. Ex. 5, Nagle Decl. ¶ 18; Ex. 4, O'Connor Decl. ¶ 22; Ex. 6, Stroessner Decl. ¶¶ 18–20; Ex. 3, Baron Decl. ¶ 7.

The closure will have devastating effects for the members of the Plaintiff Societies: the Federation of Associations in Behavioral and Brain Sciences (FABBS), an association of societies of behavioral and brain scientists and university psychology and neuroscience departments; the Society of Experimental Social Psychology (SESP), a society of psychologists; and the Social and Affective Neuroscience Society (SANS), a society of neuroscientists. Plaintiffs' members rely on the SBE Directorate as their primary source of funding. Hundreds have received awards from SBE to fund their research, and many have applications for funding that are either pending or were pending when NSF announced that SBE would close. Ex. 3, Baron Decl. ¶¶ 13, 15; Ex. 7, Kubota Decl. ¶ 20; Ex. 6, Stroessner Decl. ¶¶ 14, 25.

Other directorates are not designed to advance basic social science. Ex. 5, Nagle Decl. ¶ 18. While some SBE proposals may overlap with another directorate, scientists would have to change the proposal's scientific aims, methods, or research team to fit within it, meaning they cannot pursue the same project. Ex. 7, Kubota Decl. ¶ 23; Ex. 6, Stroessner Decl. ¶ 19; Ex. 1, Stassun Decl. ¶ 18. Other government agencies do not fund most basic social science research. *See* Ex. 8, Croteau Decl. ¶ 22; Ex. 7, Kubota Decl. ¶ 23; Ex. 2, Phillips Decl. ¶ 13. And private foundations, already "overloaded with proposals" from scholars trying to keep their labs running, cannot come close to absorbing the demand. Ex. 9, John Doe Decl. ¶ 19; Ex. 1, Stassun Decl. ¶ 17.

No amount of later funding can repair the damage that will be done. The research that many of the Plaintiff Societies' members conduct is time-sensitive. Members study phenomena that must be observed while they are happening, like attitudes during an election or a public crisis, or how people respond to new technologies like AI and social media as they develop and spread. Ex. 6, Stroessner Decl. ¶ 29; Ex. 7, Kubota Decl. ¶ 29; Ex. 10, Freeman Decl. ¶ 9; Ex. 9, John Doe Decl. ¶ 18. Once the window closes to study those events while they unfold, scientists cannot easily reconstruct cause and effect. Ex. 6, Stroessner Decl. ¶ 29. And research on evolving technology can become quickly obsolete. Ex. 9, John Doe Decl. ¶¶ 13, 25; Ex. 10, Freeman Decl. ¶ 17.

The closure also cuts off young researchers from essential early-career fellowships. NSF has already removed SBE from both its fellowship pathways for early-career researchers: its 2026 Graduate Research Fellowship solicitation dropped SBE from the participating directorates, and SBE's postdoctoral fellowship program has no open solicitation. Ex. 7, Kubota Decl. ¶ 35; Ex. 3, Baron Decl. ¶¶ 18, 34. Students typically have a short window to win a Graduate Research Fellowship, and SBE's postdoctoral fellowships are open only to researchers within three years of graduation. Ex. 8, Croteau Decl. ¶ 18; Ex. 10, Freeman Decl. ¶¶ 18–19. Researchers who miss these windows while SBE is closed will not regain eligibility later. Ex. 8, Croteau Decl. ¶ 18; Ex. 7, Kubota Decl. ¶ 36; Ex. 10, Freeman Decl. ¶¶ 18–19; Ex. 3, Baron Decl. ¶¶ 20–21.

The Directorate's closure also disrupts essential shared resources, such as longitudinal surveys, on which social scientists around the country rely. SBE is the primary funder of the nation's "big three" social science surveys: the General Social Survey (GSS), the American National Election Studies (ANES), and the Panel Study of Income Dynamics (PSID). Ex. 11, Valentino Decl. ¶¶ 5, 10; Ex. 4, O'Connor Decl. ¶ 24; Ex. 6, Stroessner Decl. ¶ 39; Compl. ¶¶ 40–43, 80. These are critical "national resources for research and teaching." NSF, *FY 2023 Budget Request*, at SBE-7 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU. Social scientists refer to these

surveys as their "telescopes"—comparing them in investment and importance to the massive observatories on which astronomers around the world depend for their data. Compl. ¶ 40. More than 10,000 publications have used ANES data alone. Ex. 11, Valentino Decl. ¶ 9. SESP members have used all three surveys in their published research. Ex. 6, Stroessner Decl. ¶ 39. Absent a functioning SBE Directorate, no obvious funding mechanism currently exists for the surveys to continue. Ex. 4, O'Connor Decl. ¶ 24; Ex. 5, Nagle Decl. ¶ 20; Ex. 11, Valentino Decl. ¶ 27.

The closure also dismantles the expert review on which Plaintiffs' members' proposals depend. SBE's program officers include rotators, outside scientists with specialized expertise. Ex. 5, Nagle Decl. ¶¶ 2, 7. NSF has let SBE's rotators go and plans to reassign its remaining program officers to other directorates by the end of the year. *Id.* ¶¶ 12, 17. With SBE gone, social scientists will lose the staff who specialize in their fields and the expert panels that evaluated their work. Ex. 6, Stroessner Decl. ¶ 28; Ex. 7, Kubota Decl. ¶ 22. A former chair of the Board's Committee on Awards and Facilities explains that NSF "cannot simply migrate social science grants to other directorates," but even if it could, social scientists would face "peer-review panels that entirely lack the domain expertise required to evaluate their methodologies." Ex. 1, Stassun Decl. ¶ 18.

## ARGUMENT

"The legal standard for a motion for stay under 5 U.S.C. § 705 is identical to that of a preliminary injunction." *Venezuelan Ass'n of Mass. v. USCIS*, No. 26-13038-NMG, 2026 WL 2255272, at *2 (D. Mass. Aug. 5, 2026) (Gorton, J.) (citation omitted). The Court should enter relief if (1) Plaintiffs are likely to succeed on the merits, (2) they are likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in their favor, and (4) relief is in the public interest. *Id.* "The court may accept as true well-pleaded allegations in the complaint and uncontroverted affidavits." *Massachusetts v. Dep't of Educ.*, 828 F. Supp. 3d 198, 211 (D. Mass. 2026) (quotation marks and brackets removed). Those elements are met here.

## I. Plaintiffs are likely to succeed on the merits.

### A. The decision to close the SBE Directorate violates the NSF Act and the APA.

The APA requires a court to "hold unlawful" and "set aside" final agency actions that are "arbitrary" or "capricious" or "not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs are likely to show that the closure of the SBE Directorate violates those standards.

#### i. The decision to close the Directorate is a final agency action.

The decision to close the SBE Directorate is a final agency action reviewable under the APA. An agency action is final if it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) determines "rights or obligations" or has "legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted). Given the "basic presumption of judicial review," the inquiry is a "pragmatic" and "flexible" one. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 149–50 (1967); *accord Hawkes*, 578 U.S. at 599.

The decision to close the Directorate meets both prongs. It is not "tentative or interlocutory." *Hawkes*, 578 U.S. at 597. It came from the highest-ranking officials at NSF, who directed staff to clear SBE's books by paying off multi-year grants and indicated that NSF would terminate all rotators and reassign all permanent staff by the end of the year. Ex. 4, O'Connor Decl. ¶¶ 17, 21; Ex. 5, Nagle Decl. ¶¶ 12–13, 17. The decision "mark[ed] the 'consummation' of the agency's decisionmaking process" even though NSF staff would need to take steps to wind down the Directorate. *Biden v. Texas*, 597 U.S. 785, 808 (2022) (directive to "take all appropriate actions to terminate" program was final); *Univ. Corp. for Atmospheric Rsch. v. Nat'l Sci. Found.*, No. 1:26-cv-01061, 2026 WL 2533392, at *7 (D. Colo. June 1, 2026) (rejecting NSF's argument that another restructuring was not final agency action until it was actually carried out; the government's argument "confuse[d] the decision … with the implementation" of it).

The decision also had "legal consequences." *Hawkes*, 578 U.S. at 597 (citation omitted). In

*Biden v. Texas*, a memo that "bound [agency] staff by forbidding them to continue [a] program" was a final agency action. 597 U.S. at 808. Here, NSF eliminated an entire *group* of programs that funded two thirds of an entire scientific sector. NSF, *FY 2023 Budget Request*, at SBE-3 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU. That decision binds SBE staff, who cannot "continue the program[s] in any way" once the SBE Directorate closes. *Biden*, 597 U.S. at 808. It also has legal consequences for scientists across the country. Because of the closure, NSF will not award grants for basic SBE research that does not fit into another directorate's ambit; graduate students and recent graduates have lost access to NSF-funded social science fellowships, Ex. 8, Croteau Decl. ¶¶ 16, 18, and widely used resources, including the three most important social science surveys in the country, have lost their source of funding. Ex. 11, Valentino Decl. ¶ 14; Ex. 12, Craig Decl. ¶¶ 20–21; Ex. 4, O'Connor Decl. ¶¶ 24–25; Ex. 5, Nagle Decl. ¶ 20.

NSF personnel also face legal consequences. To implement the closure decision, NSF has terminated program officers on assignment from universities by refusing to renew their contracts, and it has reassigned permanent staff to other directorates. Ex. 4, O'Connor Decl. ¶ 21; Ex. 5, Nagle Decl. ¶¶ 12, 17; *see Widakuswara v. Lake*, 779 F. Supp. 3d 10, 33 (D.D.C. 2025) (placement of employees on administrative leave and termination of contract staff were final agency actions).

The First Circuit has held that similar decisions to dismantle agency units and terminate staff were final agency actions. In *New York v. Kennedy*, the court held that an agency's decision to "streamline [its] functions" by terminating employees, "consolidating sub-agencies, and reducing the number of regional offices" was final agency action when followed by the "dismantling of sub-agencies" and a reduction in force. 155 F.4th 67, 70, 76 (1st Cir. 2025). So too here. NSF has made the decision to dismantle a sub-agency, terminate and reassign all its staff, and end all its grantmaking. That decision is reviewable under the APA.

**ii. The closure decision violates the statutes that govern NSF.**

The closure is also contrary to law. Under its governing statute, NSF may not remove a directorate without consulting the Board. The NSF Act provides: "[t]here shall be within the Foundation such Divisions as the Director, in consultation with the Board, may from time to time determine." 42 U.S.C. § 1866. "'[C]onsultation' means what consultation ordinarily means: '[t]he act of asking the advice or opinion of someone.'" *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 117 (1st Cir. 2002) (quoting Black's Law Dictionary 311 (7th ed. 1999)). To close a directorate, then, the NSF Director had to "ask[] the advice or opinion" of the Board "or afford[] them a proper opportunity to express their opinions," as "consultation" requires. *Id.* at 120.

That did not happen here. No one even *notified* the Board about the closure decision. Ex. 1, Stassun Decl. ¶¶ 12–13; Ex. 2, Phillips Decl. ¶ 11. NSF thus "determine[d]" what "Divisions" are "within the Foundation" without the required "consultation with the Board." 42 U.S.C. § 1866. The closure also violates NSF's mandate to support research through the SBE Directorate: NSF cannot support research "working through" a Directorate that does not exist. Pub. L. No. 115-402, § 4(a), 132 Stat. 5346 (2018) (codified at 42 U.S.C. § 1862p, note).

**iii. The closure decision violates the Federal Vacancies Reform Act.**

The decision to shut down the SBE Directorate was also unlawful because it was made by neither the Board nor anyone authorized to act as "the Director." 42 U.S.C. § 1866.

Under the NSF Act, the Director must be "appointed by the President, by and with the advice and consent of the Senate." 42 U.S.C. § 1864(a). The Federal Vacancies Reform Act (FVRA) is the "exclusive means for temporarily authorizing an acting official to perform the functions and duties" of such an office absent Senate confirmation. 5 U.S.C. § 3347(a). It permits an acting official to serve in that role only if he or she was the "first assistant" to the Director, or designated by "the President (and only the President)," and satisfies other prerequisites. 5 U.S.C. § 3345(a).

If a person is not authorized to perform the duties of an office under the FVRA, "[a]n action taken" by that person "in the performance of any function or duty of [the] vacant office . . . shall have no force or effect" and "may not be ratified" later. 5 U.S.C. § 3348(d)(1)–(2).

Neither Defendant Brian Stone nor anyone else was properly authorized to act as the Director when NSF decided to eliminate the SBE Directorate. NSF's Senate-confirmed Director resigned on April 24, 2025. NSF, *Statement by Director Sethuraman Panchanathan on His Departure*, (Apr. 24, 2025), https://perma.cc/2F8M-RVSH. By statute, the Director's "first assistant" under the FVRA, 5 U.S.C. § 3345(a)(1), is the "Deputy Director" of NSF, 42 U.S.C. § 1864a, not the Chief of Staff, and there was no Deputy Director when the Senate-confirmed Director resigned on April 24, 2025. Thus, Brian Stone could only serve as the Acting Director if "the President (and only the President)" had designated him to serve in that role. 5 U.S.C. § 3345(a)(2)–(3).

But NSF has not claimed that the President so designated him, and the agency does not refer to Stone as the Acting Director. Instead, it refers to him as the "Chief of Staff, performing the duties of the Director," NSF, *NSF FY 2026–2030 Strategic Plan* (Apr. 3, 2026), https://perma.cc/TA73-WYSN, a phrase agencies use when an official is acting pursuant to an internal agency delegation, rather than the Presidential directive that the FVRA requires. *See* Anne Joseph O'Connell, Admin. Conf. of the U.S., *Acting Agency Officials and Delegations of Authority*, at 11, 63 (Dec. 1, 2019), https://perma.cc/4FCS-7WEL.

Agencies may not satisfy the FVRA with such internal, non-Presidential delegations. *Widakuswara v. Lake*, 832 F. Supp. 3d 55, 65–66 (D.D.C. 2026); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 34 (D.D.C. 2020). Because Brian Stone was not authorized to act as the Director of NSF under the FVRA, his decision to eliminate the SBE Directorate is "not in accordance with law" under the APA, 5 U.S.C. § 706(2), and void under the FVRA, *see* 5 U.S.C. § 3348(d)(1)–(2).

**iv. The closure is arbitrary and capricious.**

Under the APA, courts must set aside agency action that is "arbitrary" or "capricious," 5 U.S.C. § 706(2)(A)—that is, "not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation modified). The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). An action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider" or "failed to consider an important aspect of the problem." *Id.* "When an agency changes course," it must weigh any "reliance interests" and consider "alternatives that are within the ambit of the existing policy." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 29–30 (2020) (citation modified).

NSF fell well short of these standards here. If allowed to proceed, the dissolution of the SBE Directorate would mark the first time since 1957 that NSF will not have a program or division focused on the SBE sciences, and it would eliminate the primary source of funding for an entire scientific sector. The agency offered no public explanation for that seismic decision, let alone a reasoned one. The lack of any apparent explanation for the decision violates the APA. *See*, *e.g.*, *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (letters terminating grants as "inconsistent with . . . Department priorities" were insufficient because they left the court to "guess at the theory underlying the agency's action" (citation omitted)).

Without an explanation, NSF failed to address multiple "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. It did not consider how NSF would meet its statutory obligation to "initiate and support basic scientific research" in the "social . . . sciences," 42 U.S.C. § 1862(a)(1), and specific social science subjects, *see* 42 U.S.C. §§ 1862u, 1862v, 1862w, 19055, 19056, 19066, 19070, without the only division designed to serve that purpose. It did not consider the predictable

disruptive effects SBE's dissolution will have on the research that depends on the Directorate for almost $250 million in funding per year, including the three longest running and most relied-on social science surveys in the United States. Nor, evidently, did it consider any "alternative[s]" to dismantling the entire Directorate. *Regents*, 591 U.S. at 30 (citation omitted).

It was "arbitrary and capricious to ignore such matters." *Id.* (citation omitted).

**B. The decision to close the SBE Directorate is ultra vires.**

Separate from the APA, the Court may enjoin agency actions that are "entirely in excess of [the agency's] delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (cleaned up). Although that standard is high, Defendants' actions meet it here. A statutory "requirement to consult" before taking action places "clear limit[s] on the agency's authority" and is "subject to non-APA review." *Nat'l Ass'n of Postal Supervisors v. United States Postal Serv.*, 26 F.4th 960, 971 (D.C. Cir. 2022). There is no question that NSF failed to consult the Board before closing the Directorate. That "refusal . . . to consult at all . . . constitutes a violation of the mandatory consultation provision." *Id.* at 974.

The closure is ultra vires for two other reasons. First, unless Defendants can identify a direction by "the President (and only the President)" that Brian Stone act as the Director, Stone's performance of the Director's duties plainly violated the FVRA, 5 U.S.C. § 3345(a), and the NSF Act, *see* 42 U.S.C. § 1866 (requiring that "the Director" must make any decision to close a division in consultation with the Board). Second, an agency "acts ultra vires when its decision is not supported by 'a contemporaneous justification by the agency itself,' but only a 'post hoc explanation [by] counsel.'" *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 976 (citation omitted). But Defendants provided zero explanation for closing the SBE Directorate.

**II. The closure of the SBE Directorate irreparably harms Plaintiffs and their members.**

Plaintiffs and their members face "a significant risk of irreparable harm if the injunction is

withheld." *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (citation omitted). An injury is irreparable when "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). The loss of grant funding meets that standard when it causes non-pecuniary harms that later funding cannot compensate, like "impediments to planning, hiring, and operations; and disruptions to research projects." *Rhode Island v. Trump*, 155 F.4th 35, 49 (1st Cir. 2025) (citation omitted); *accord Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 47–48 (1st Cir. 2026) ("nonpecuniary harms from . . . funding freezes" were irreparable).

The closure of the SBE Directorate harms Plaintiffs and their members in at least four ways: it forecloses time-sensitive research, disrupts long-running studies, derails careers, and dismantles shared research infrastructure. Later funding cannot repair any of these harms.

**A. The SBE Directorate's closure forecloses time-sensitive research.**

First, SBE's closure forecloses time-sensitive research. Many of Plaintiffs' members study phenomena that must be observed while they unfold, like how people respond to emerging technologies. Ex. 6, Stroessner Decl. ¶ 29; Ex. 7, Kubota Decl. ¶ 29. For such proposals, scientists need to collect data soon, or they lose the opportunity to capture it.

Drs. Jon Freeman and John Doe, two members of the Plaintiff Societies, provide illustrative examples. Both need funding for projects that study human-AI interactions. Ex. 10, Freeman Decl. ¶¶ 5, 8; Ex. 9, John Doe Decl. ¶¶ 4, 8–11. Dr. John Doe has a pending proposal with SBE that was "recommended for funding," meaning it was almost certain to be funded. Ex. 9, John Doe Decl. ¶¶ 6–7; Ex. 5, Nagle Decl. ¶ 8; Ex. 4, O'Connor Decl. ¶¶ 8, 12. But the proposal has no "realistic" path if SBE remains closed. Ex. 9, John Doe Decl. ¶ 19. Dr. Freeman, who regularly receives SBE funding, has two proposals ready to submit. Ex. 10, Freeman Decl. ¶¶ 14–15. Both scientists need to collect data soon. Ex. 9, John Doe Decl. ¶ 18; Ex. 10, Freeman Decl. ¶¶ 9, 16–17. Otherwise,

these scientists will lose the chance to "establish baseline measurements, follow individuals over time, and identify how new patterns of social behavior emerge as AI capabilities and adoption evolve." Ex. 10, Freeman Decl. ¶ 9. "For this type of critical basic social science research, there is no realistic substitute for SBE funding." Ex. 9, John Doe Decl. ¶ 19.[5]

Consider Dr. Freeman's two proposals—one following people with little experience with conversational AI as they begin to use it, and one evaluating how the brain responds to AI agents. Ex. 10, Freeman Decl. ¶¶ 14–15. Both depend on recording how people first perceive and respond to AI agents before those interactions become routine. *Id.* ¶¶ 9, 14–17. A year or two from now, those "first encounters" will be over, and "AI systems themselves will have changed," along with "the social norms and expectations surrounding their use." *Id.* ¶ 17. Funding restored later "cannot recover those missing baseline measurements, recreate earlier technological conditions, or reconstruct the psychological and neural changes that occurred during the intervening period." *Id.* So "[e]very additional month without a functioning SBE funding mechanism represents a loss of scientific opportunity that cannot be remedied by funding awarded years later." *Id.*

Moreover, research on fast-developing technologies loses value as time passes. John Doe's pending SBE proposal would study how current AI models recommend uniform approaches to problems that are "optimal" for individuals but can leave society worse off when people no longer attack problems from different angles. Ex. 9, John Doe Decl. ¶¶ 5, 9. His research has "enormous practical implications" for how to design and use AI tools for contexts like drug development, where a diversity of approaches can lead to quicker cures. *Id.* ¶ 10. But as Doe's proposal languishes, governments and industries establish AI policies and practices that become more ingrained as they build AI into their everyday business. *Id.* ¶ 12. Those systems are hard to change

[5] John Doe submits his declaration under a pseudonym because he fears retaliation in his pending grant application if his name becomes public. Ex. 9, John Doe Decl. ¶¶ 1, 6–7.

once they take root. *Id.* ¶¶ 12, 14. Research that comes later therefore loses "the chance to produce results that are still relevant and can still be acted on." *Id.* ¶¶ 12, 14–15, 18. And competing researchers from other countries continue to publish in the same space. *Id.* ¶ 25. For those reasons, every month Doe cannot obtain funding endangers the value of his research.

Drs. Freeman and Doe's situations are not unique. Other members of Plaintiff Societies rely on the SBE Directorate to fund similarly time-sensitive research. Ex. 6, Stroessner Decl. ¶¶ 29–30; Ex. 7, Kubota Decl. ¶ 29; Ex. 13, Twenge Decl. ¶¶ 10, 11. Hundreds have received grants from the SBE Directorate in the last ten years, and they regularly apply to NSF for funding. Ex. 3, Baron Decl. ¶ 13. The "uncertainty around the ability to sustain future grant applications, resulting in the loss of direct research," causes irreparable harm to these members. *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025), *aff'd*, 164 F.4th 1 (1st Cir. 2026); *accord Ass'n of Am. Univs. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 124, 140 (D. Mass. 2025) (finding universities suffered irreparable harm because their "projects cannot proceed, progress in various research areas will be disrupted, and in some cases, will end"); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 149 (D. Mass. 2025) (same where research would "be inordinately delayed" or "entirely abandoned" due to loss of grant funding).[6]

**B. The closure disrupts ongoing studies.**

The closure causes a "disruption of ongoing research," which also inflicts irreparable harm.

[6] "[T]he fact that Plaintiffs are not guaranteed any particular future NSF award does not render their claims of injury speculative or conjectural." *Ass'n of Am. Universities v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 141 (D. Mass. 2025); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 26-cv-30117-MJJ, 2026 WL 2521944, at *11 (D. Mass. Aug. 26, 2026) (lack of "guaranteed entitlement" to a particular grant did not preclude irreparable harm). Given that hundreds—likely thousands—of Plaintiffs' members have been awarded grants from SBE and apply each year, many would likely receive future grants if SBE remained open. Ex. 3, Baron Decl. ¶ 13; Ex. 6, Stroessner Decl. ¶¶ 14–15; Ex. 14, Jane Doe Decl. ¶¶ 9, 19. As explained above, John Doe's proposal was recommended for funding before SBE's closure was announced, Ex. 9, John Doe Decl. ¶¶ 6–7, meaning it was likely to be funded, Ex. 4, O'Connor Decl. ¶¶ 8, 12.

*Ass'n of Am. Univs.*, 788 F. Supp. 3d at 140; *see Rhode Island*, 155 F.4th at 49 (recognizing that "disruptions to research projects" caused by withheld grant funding may be irreparable).

The closure has halted TESS, a widely used resource co-led by SESP member Dr. Maureen Craig, which ran researchers' experiments free of charge on nationally representative samples of American adults. Ex. 12, Craig Decl. ¶¶ 6–8, 11. The SBE Directorate has funded TESS since 2001. *Id.* ¶ 18. In 2025, SBE program officers said that they would not be able to fund TESS that year but indicated that they "committed to funding [TESS]" because TESS is "an important component" of SBE infrastructure, and they suggested they would make the award in 2026. *Id.* ¶ 20. Then the SBE Directorate announced its closure. Now, Dr. Craig and her colleagues have no other NSF program to which they can apply for replacement funding to keep the project running. *Id.* ¶ 21. As a result, the project has suspended its operations. *Id.* TESS's core team, Dr. Craig included, has gone without compensation since the last grant ended, and two members have kept the website running without pay. *Id.* ¶¶ 22, 27. The longer the suspension lasts, the harder TESS will be to rebuild: staff who know how to run it will need to move on, and later funding "would not by itself restore this operational capacity." *Id.* ¶¶ 25–26. The ongoing interruption of the project and "impending loss of staff" cause irreparable harm to Dr. Craig and the many scientists who rely on TESS to conduct their research. *Woonasquatucket*, 186 F.4th at 47–48.

Plaintiffs' members' longitudinal studies face interruption due to loss of funding, inflicting irreversible damage. Dr. Croteau applied to NSF for funding to continue a longitudinal study, which requires her to collect data on regular timeframes from the same population. Ex. 8, Croteau Decl. ¶ 24. Each month of delay undermines the value of her results and risks aging participants out of the developmental window she is studying. *Id.* And if SBE remains closed, even if she could obtain funding to continue her project from another source, her research would cost three times as much because SBE funded the software program she would use, which will no longer be free or

open access starting in January 2027 if it does not receive continued funding. *Id.*

Other examples abound. A study run by SESP members supports new data collection in the Minnesota Longitudinal Study of Risk and Adaptation, which has followed the same individuals for approximately 50 years, since birth. Ex. 6, Stroessner Decl. ¶ 30. Its grant runs out in 2027, and any further NSF-funded data collection would require a new award. *Id.* Another SESP member's nationally representative panel, which has tracked more than 6,500 Americans since the start of the COVID-19 pandemic to understand how people respond psychologically as collective stressors pile up, cannot continue beyond 2027 without new SBE funding. *Id.* Without an SBE Directorate, these ongoing studies are unlikely to receive renewed funding.

As the First Circuit recognized in refusing to disturb a stay of NIH grant terminations, "there is no way to recover the lost time, research continuity, or training value once disrupted." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 55 (1st Cir. 2025).

### C. The closure inflicts lasting harm on Plaintiffs' members' careers.

The Directorate's closure also irreparably harms members' careers. First, it forecloses career opportunities that are open only within fixed eligibility windows. Like other directorates, the SBE Directorate used to fund postdoctoral fellowships for recent Ph.D. graduates, a virtual prerequisite for tenure-track faculty positions at competitive universities. Ex. 8, Croteau Decl. ¶ 15; Ex. 10, Freeman Decl. ¶ 18. But with SBE gone, recent graduates like Dr. Croteau no longer have access to those opportunities. *See supra* note 4. Dr. Croteau is a promising candidate. While a Ph.D. student in 2025, Dr. Croteau submitted a research proposal to the SBE Directorate that was rated "competitive," but was ultimately denied after NSF decided to close SBE. Ex. 8, Croteau Decl. ¶¶ 8, 13. Dr. Croteau could submit the same proposal again with improvements, along with another promising project, if SBE were still open for postdoctoral fellowship submissions. Without the SBE Directorate, however, she has not been able to obtain funding for the project. *Id.* ¶¶ 19–21,

23. And her window of eligibility for an SBE postdoctoral fellowship closes in September 2029. *Id.* ¶ 18. Many SANS members, 73 percent of whom are graduate students and early-career researchers like Dr. Croteau, are in the same position. Ex. 7, Kubota Decl. ¶ 9.

Such a loss of irreplaceable early-career opportunities is irreparable harm. *See Ozturk v. Trump*, 819 F. Supp. 3d 45, 61 (D. Mass. 2025) (doctoral researcher "losing out on a unique opportunity to work with her advisor on a project that would further her doctoral training and professional development" constituted irreparable harm); *Liu v. Noem*, 780 F. Supp. 3d 386, 403–04 (D.N.H. 2025) (Ph.D. researcher's "inability to continue his research" within limited available windows had "significant and irreparable consequences for his academic trajectory").

Second, the lack of funding opportunities from SBE threatens the reputations and careers of Plaintiffs' members who are junior faculty. The old adage, "publish or perish," is as true as ever in academia. Funding gaps that interrupt young researchers' publication records cause irreparable harm to their careers. *See Thakur v. Trump*, 800 F. Supp. 3d 1044, 1070 (N.D. Cal. 2025) (finding that loss of grant funding caused postdoctoral fellows and their advisors irreparable harm because they would be unable to complete their projects and publish, crediting evidence that a "gap in publications . . . will make them far less desirable in the job market and potentially make them unemployable"). Dr. Sparkman is up for tenure this academic year, a decision that turns on his publication record and ability to attract outside research funding that SBE no longer offers. Ex. 15, Sparkman Decl. ¶¶ 15–16. A later award cannot add data or publications to a record that a tenure committee has already reviewed. Ex. 6, Stroessner Decl. ¶¶ 27, 33.

The loss of funding opportunities for graduate and postdoctoral researchers also harms senior scientists who need them to staff their labs. Ex. 3, Baron Decl. ¶ 19. Graduate admissions run on a fixed calendar, and Dr. John Doe, whose lab has gone from five graduate students to none, is unlikely to be able to admit any in the coming cycle without funding by January or February.

Students who would have joined his lab will go elsewhere, and some will never become scientists at all. Ex. 9, John Doe Decl. ¶¶ 20–22. Dr. Freeman also funds his postdoctoral researcher with a grant from the SBE Directorate, but Dr. Freeman will need to let that researcher go if he cannot obtain another such grant before the researcher ages out of eligibility in 2027. Ex. 10, Freeman Decl. ¶ 18. A ruling after that window closes cannot restore that eligibility. Similarly, SANS's trainee members are already abandoning research and leaving the country, and the SANS members who mentor them are losing the researchers they trained. Ex. 7, Kubota Decl. ¶¶ 9, 31, 37–38.

The resulting reduction in staff and loss of research capacity inflicts immeasurable harm on these researchers and on the science their labs advance. Ex. 5, Nagle Decl. ¶ 19; Ex. 9, John Doe Decl. ¶¶ 20–23; *see Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026) (finding irreparable harm to lab directors based on "layoffs of team members, interruption of graduate programs, and the potential complete loss of projects, all of which will harm Plaintiffs' professional reputations"); *see also Univ. Corp. for Atmospheric Rsch.*, 2026 WL 2533392, at *12–13 ("significant 'brain drain'" that followed an NSF decision irreparably harmed plaintiffs because they could not "easily replace employees with the level of education, specialized training, and institutional knowledge necessary to operate and maintain" the research facility).

**D. The closure dismantles irreplaceable research infrastructure.**

Moreover, Plaintiffs' members depend on research resources that SBE funds and that no other source can replace. These include the "big three" national surveys (ANES, GSS, and PSID) and Time-sharing Experiments for the Social Sciences (TESS). Surveys like the big three surveys "fall outside the mission of every other NSF directorate." Ex. 5, Nagle Decl. ¶ 20. And cutting off any of these shared resources irreparably harms those who rely on it. In *Rhode Island v. Trump*, the court found irreparable harm to plaintiff states that relied on a federal library survey for their own planning, where the survey's loss would "represent the loss of decades of information that is

critical for community development and planning." 781 F. Supp. 3d 25, 52 (D.R.I. 2025). As users of the big three surveys and TESS, Plaintiffs' members stand in the same position.

Plaintiffs' members rely heavily on these resources. SESP members have used GSS to study happiness and income inequality, the PSID to study time use among older couples, and the ANES to study racial prejudice and voting, religion and political attitudes, and implicit and explicit prejudice. Ex. 6, Stroessner Decl. ¶ 39. Members of other FABBS societies have used surveys to study how recessions alter Americans' class identities, perceptions of racial discrimination, attitudes towards scientists, and children's academic interests. Ex. 3, Baron Decl. ¶¶ 24–25. In a groundbreaking study, Dr. Jean Twenge traced generational change in Americans' political identities using ANES data from 1948 to 2020, and she drew on the GSS for widely cited findings on trust and happiness. Ex. 13, Twenge Decl. ¶¶ 8, 13, 14.

Without the SBE Directorate, these surveys will lose NSF funding. And without new funding by February 2027, the ANES must begin shutting down. Ex. 11, Valentino Decl. ¶ 16. Once that happens, its staff, who have about 100 years of combined experience on the project, will begin to leave, and the ANES could not reassemble its team, rebuild its sample, and field a study in time for the 2028 election. *Id.* ¶¶ 18, 22. A gap in 2028 would permanently damage the ANES record. Researchers cannot measure voters' attitudes during an election after the fact, so the 2028 election would have no ANES record at all. *Id.* ¶ 19. For example, Dr. Twenge, a member of one of FABBS's societies, planned to use data from ANES to study the 2028 election—"the first . . . of the decade not shaped by the COVID 19 Pandemic, the first in which all of Generation Z can vote, and the first in which members of Generation Alpha can vote"—for a book. Ex. 13, Twenge Decl. ¶¶ 11–12. But if ANES shutters, she "will not be able to understand" how the political views and voting behavior of members of Gen Alpha and Gen Z "compare to previous generations." *Id.*

A gap in the surveys would also break the comparability that lets researchers track long-term

trends. If the study later resumed, researchers would struggle to tell whether differences reflect real change in the public or changes in how the study was rebuilt. Ex. 11, Valentino Decl. ¶ 20; Ex. 13, Twenge Decl. ¶ 10. This would diminish the value of the survey for Plaintiffs' members, a loss that courts have recognized persists even if research resumes. *See Massachusetts*, 770 F. Supp. 3d at 321 ("even if trials were to resume, 'the lack of continuity [would] compromise[ ] the scientific results'"); *Am. Pub. Health Ass'n*, 145 F.4th at 55 (relying on evidence that an abrupt funding cutoff would cause studies, "conducted over the course of many years, to 'lose validity'")

The closure of TESS, due to a lack of SBE funding, also undermines members' research. Without it, representative samples are unaffordable for many researchers, especially those early in their careers. Ex. 6, Stroessner Decl. ¶ 36; Ex. 12, Craig Decl. ¶¶ 9, 10. SESP members have used TESS in research on demographic change, diversity, close relationships, and growth mindset. Ex. 12, Craig Decl. ¶ 13; Ex. 6, Stroessner Decl. ¶¶ 35, 37. But now that TESS has suspended operations, these scientists lack access to that key resource. Ex. 12, Craig Decl. ¶ 21.

The "degradation" of this "vital" research "infrastructure" irreparably harms Plaintiffs' members. *Massachusetts*, 770 F. Supp. 3d at 322. The "viability" of shared research facilities "will be compromised," and later funding "would not by itself restore [their] operational capacity" or recover research that members lose in the meantime. *Id*. at 323; Ex. 12, Craig Decl. ¶ 26.

## III. The balance of equities and public interest favor relief.

Preliminary relief would also advance the public interest. As explained above, thousands of social and behavioral scientists and hundreds of institutions around the country rely on the SBE Directorate for funding. That support pays off exponentially for the public, Compl. ¶ 31, as NSF itself has repeatedly recognized, *see, e.g.*, NSF, *FY 2023 Budget Request*, at SBE-3 (Mar. 28, 2022), https://perma.cc/RA8P-LVGU, and the Senate Appropriations Committee recently reaffirmed. *See* S. Rep. No. 119-44, at 164 (2025); S. Comm. on Appropriations, 119th Cong.,

*Explanatory Statement for Commerce, Justice, Science, and Related Agencies Appropriations Bill, 2027*, at 192 (2026), https://perma.cc/9W2M-K94F (reiterating the "fundamental importance of the research the SBE Directorate supports" and disapproving of its "termination"). But as of October 2026, about 600 proposals were reportedly pending with SBE, with no SBE review panels scheduled. Ex. 3, Baron Decl. ¶ 15; Daniel Garisto, *Exclusive: "Complete devastation"—How NSF gutted its social sciences research*, Science (Oct. 6, 2026).

Conversely, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Woonasquatucket*, 186 F.4th at 48. To the contrary, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).

## IV. The Court should stay the closure and issue a preliminary injunction.

Because Plaintiffs satisfy the requirements of an APA § 705 stay and preliminary injunction, the Court should stay the closure and enjoin NSF to restore the status quo, in which the Directorate solicited and reviewed grant proposals for social science research.

Section 705 of the APA authorizes a court to "issue all necessary and appropriate process [1] to postpone the effective date of an agency action *or* [2] to preserve status or rights pending conclusion of the review proceedings." *Woonasquatucket*, 186 F.4th at 53–54 (quoting 5 U.S.C. § 705). Such relief is not limited to redressing "only party-specific harm." *Id.* at 55; *see Venezuelan Ass'n of Mass.*, 2026 WL 2255272, at *5 (Gorton, J.) (holding that notwithstanding the Supreme Court's decision in *Trump v. CASA*, APA relief "need not be limited to the parties"). Section 705 relief should be designed "to reestablish the status quo"—"'the last *uncontested* status which preceded the pending controversy'"—across the board. *Neguse v. ICE*, 813 F. Supp. 3d 45, 99 (D.D.C. 2025) (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022)).

To preserve the status quo ante here, the Court should enjoin NSF to keep open the SBE Directorate and continue to solicit and review grant proposals according to its own *Proposal and Award Policies and Procedures Guide*, NSF 24-1 (May 20, 2024), https://perma.cc/WUB3-SDDU—just as the agency did before April 2026, *see* Ex. 4, O'Connor Decl. ¶¶ 7–9; Ex. 5, Nagle Decl. ¶¶ 6–7, and just as it still does for other directorates. *See* NSF, *August 2026 Notices of Funding Opportunity for Foundational Research* (Aug. 17, 2026), https://perma.cc/4YS3-WVZ3. In the alternative, the Court may also issue an injunction under its equitable powers, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and Federal Rule of Civil Procedure 65.

Injunctive relief under the APA or the Court's equitable powers is necessary to provide "complete relief" to Plaintiffs. *California v. Trump*, 840 F. Supp. 3d 37, 83 (D. Mass. 2026) (court may "impose [a universal injunction] if it is necessary to do so to provide the plaintiff with complete relief" (brackets in original) (quoting *Doe v. Trump*, 157 F.4th 36, 80–81 (1st Cir. 2025))). Plaintiffs' members comprise hundreds, likely over a thousand, scientists who apply to the SBE Directorate for funding, including a substantial proportion of the researchers with pending applications before SBE. Ex. 3, Baron Decl. ¶¶ 13, 35. To identify all members who have pending applications or plan to apply for SBE grants in the near future, Plaintiffs would have to poll thousands of people—an effort that would be unlikely to yield even close to a complete list. *Id.* And relief that simply ordered Defendants to consider identified members' applications would be unfair to other applicants. Accordingly, the relief Plaintiffs request is appropriate even to the extent it benefits nonparties. *See Woonasquatucket*, 186 F.4th at 35–36, 53–54 (declining to stay order enjoining agency from freezing grant funds, even though it reached grants awarded to nonparties).

## CONCLUSION

Accordingly, the Court should grant an APA § 705 stay and a preliminary injunction as set forth in the attached proposed order.

November 17, 2026

Respectfully submitted,

/s/ Sean Ouellette
Sean Ouellette
Sriram Sridharan*
Lesley Farby*
Robin F. Thurston*
Democracy Forward
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
souellette@democracyforward.org

*Counsel for Plaintiffs*

**Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I served this document and attachments on all registered participants by filing it through the Court's CM/ECF system. I also sent a copy by email to counsel for Defendants and caused a copy to be served by mail.

Dated: November 17, 2026

/s/ *Sean Ouellette*
Sean Ouellette

*Counsel for Plaintiffs*